Filed 12/13/18 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| CHRISTYNA ARISTA, Individually and as Personal Representative, etc. et al.,,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>COUNTY OF RIVERSIDE,<br><br>    Defendant and Respondent. | E068432<br><br>(Super.Ct.No. RIC1502475)<br><br>ORDER MODIFYING OPINION; AND DENIAL OF PETITION FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

The petition for rehearing filed by respondent on November 29, 2018, is denied. The opinion filed in this matter on November 20, 2018, is modified as follows:

I.      The second-to-last sentence of the last paragraph on page 4—"Santiago Trail was a maintained fire access road that accommodates four-wheel drive or off-road vehicles" is modified to read:  "Santiago Trail is a maintained fire access road that accommodates four-wheel drive or off-road vehicles."

1

II.     In the Discussion, section B, subsection 2, a new paragraph is inserted at the start of that subsection as follows:

"2.     *LAW*

Under the provisions of the California Tort Claims Act, 'a public employee is liable for [an] injury caused by his act or omission to the same extent as a private person,' except as otherwise specifically provided by statute. [Citation.]  In addition, the Tort Claims Act further provides that '[a] public entity is liable for [an] injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would . . . have given rise to a cause of action against that employee,' unless 'the employee is immune from liability.' "  (*Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 715.)  In the instant case, because the Family alleged the law enforcement officers were "acting within the scope of [their] employment when [they] engaged in the conduct [and omissions] at issue in this case, the initial question of duty, and [the County's] potential liability . . . turns on ordinary and general principles of tort law."  (*Id.* at pp. 715-716.)"

The subsection then continues with the next paragraph, which begins "The elements of a wrongful death cause of action are . . . ."

III.     In the Discussion, section B, subsection 3, the fourth paragraph is modified to read as follows:

2

"Assuming the foregoing facts are true, Sheriff's Department personnel (the deputies), through their actions, undertook the responsibility of rescuing the victim because the deputies were actively involved in all aspects of locating the victim, and by appointing an Incident Commander, the deputies signaled that they were taking control of the rescue. Therefore, the deputies had the duty to exercise due care in performing the rescue, which means (a) using reasonable care not to increase the risk of harm, and (b) following through in a reasonable manner after inducing reliance on the rescue.

IV. In the Discussion, section B, subsection 3, the first sentence of the seventh paragraph is replaced with the following sentence: "We examine whether the SAC alleges that the deputies induced reliance on their rescue efforts."

V. In the Discussion, section B, subsection 3, the eighth paragraph is modified to read as follows:

"Wife did not organize her own search team until after learning that the deputies would be delaying their efforts. That Wife did not start her efforts until hearing of the deputies' delay suggests Wife was relying on the deputies' search efforts. Accordingly, the Family has sufficiently pled that the deputies undertook rescue efforts and induced reliance on those efforts. In sum, the trial court erred by ruling the deputies did not owe a duty of care."

VI.     In the Discussion, section B, subsection 3, the first sentence of the ninth paragraph is replaced with the following sentence: "The County's demurrer to the negligence-based causes of action was focused solely upon the issue of duty; the County did not argue the issues of breach, causation, and damages"

VII.    In the Discussion, section D, the second sentence of the second paragraph is replaced with the following sentence: "Thus, the NIED cause of action relies upon the duty to conduct the search with reasonable care. (See generally *Huggins v. Long Drug Stores California, Inc.* (1993) 6 Cal.4th 124, 129-130 [discussing direct and bystander liability, and the respective duties owed, in NIED claims].)"

VIII.   In the Discussion, a new section "E" is added, as follows:

"E.     IMMUNITY

The County contends the deputies and the County are immune from liability pursuant to Health and Safety Code, section 1799.107, subdivision (b).

The law provides, "[N]either a public entity nor emergency rescue personnel shall be liable for any injury caused by an action taken by the emergency rescue personnel acting within the scope of their employment to provide emergency services, unless the action taken was performed in bad faith or in a grossly negligent manner." (Health & Saf. Code, § 1799.107, subd. (b).)

"Bad faith" is not defined in the statute. (Health & Saf. Code, § 1799.107.) "[C]ase law has defined gross negligence as ' "the want of even scant care or an extreme departure from the ordinary standard of conduct." ' " (*Eastburn v. Regional Fire Protection Authority* (2003) 31 Cal.4th 1175, 1185-

4

1186.)  In the SAC, the Family alleged (1) a ping of the victim's cell phone revealed the phone was in the area of Santiago Peak; (2) Lieutenant Hall said to Deputy Zaborowski "he was 'not sure what we're doing here,' that [the victim] was 'probably just running around on his wife' and was 'just covering his tracks,' suggesting that [the victim] was not missing, but instead involved in some adulterous affair"; and (3) Lieutenant Hall told Wife, " '[I]f it was a child, [he] would send a helicopter out there right now.' "

The facts pled by the Family, when accepted as true, support a finding of a want of even scant care.  The allegation that Lieutenant Hall would have sent a helicopter for a child reflects there were resources that could have been deployed the night of March 1 to further the search efforts that had been undertaken.  The allegation that Lieutenant Hall believed the victim was having an affair reflects that, despite having resources to continue searching for the victim, Lieutenant Hall chose to suspend the search overnight because he believed the victim was not missing.  The allegation that the victim's cell phone was in the area of Santiago Peak, reflects there was reason to believe the victim was missing, but Lieutenant Hall carelessly disregarded that evidence and chose to postpone search efforts until the morning.  Because the allegations, when accepted as true, support a finding of a want of even scant care, we conclude the immunity of Health and Safety Code section 1799.107 does not apply at this stage of the proceedings."

IX.    In the Discussion, section "E" is relettered section "F."

5

X.     In the Discussion, section "F" is relettered "G."

Except for these modifications, the opinion remains unchanged.  The modifications do not effect a change in the judgment.

CERTIFIED FOR PUBLICATION


MILLER _____
                                                        J.

We concur:

McKINSTER _____
                Acting P. J.


FIELDS _____
                J.

Filed 11/20/18 (unmodified version)

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| CHRISTYNA ARISTA, Individually and as Personal Representative, etc., et al., | |
| Plaintiffs and Appellants, | E068432 |
| | (Super.Ct.No. RIC1502475) |
| v. | |
| | OPINION |
| COUNTY OF RIVERSIDE, | |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County. Daniel A. Ottolia, Judge. Reversed in part; affirmed in part.

Tiedt & Hurd, John E. Tiedt and Marc S. Hurd for Plaintiffs and Appellants.

Disenhouse Law, Bruce E. Disenhouse, J. Pat Ferraris; Arias & Lockwood and Christopher D. Lockwood for Defendant and Respondent.

In a second amended complaint (SAC), Christyna Arista (Wife), Andres Marin-Arista, Jazmyn Nicole Marin-Arista, Christal Marin Arista, and Julyan Marin Arista sued the County of Riverside (the County) for (1) wrongful death, (2) negligence,

1

(3) negligent infliction of emotional distress, and (4) a deprivation of constitutional rights (42 U.S.C. § 1983). The trial court sustained the County's demurrer to the SAC without leave to amend. Wife, Andres, Jazmyn, Christal, and Julyan (collectively, the Family) contend the trial court erred. We reverse in part, and affirm in part.

## FACTUAL AND PROCEDURAL HISTORY

A.    <u>SAC</u>

The facts in this subsection are taken from the SAC. In 2014, Wife was married to Andres Marin (the victim). Wife and the victim shared four children: Andres, Jazmyn, Christal, and Julyan. On March 1, 2014, at approximately 6:30 a.m., the victim left the Family's residence in Corona to ride his mountain bike up Santiago Peak in the Cleveland National Forest. The bike ride would be approximately 55 miles. The victim was scheduled to arrive back home at 2:00 p.m.

Temperatures at 6:30 a.m., in Corona, were in the 50s or 60s and there was occasional light rain during the day. The victim was dressed in knee-length bike shorts, bike gloves, a bicycle jersey, calf length socks, shoes, and a helmet. The victim carried $10, water, snacks, and his cell phone. At 3:00 p.m., the victim had not returned home. Wife called the victim's cell phone and sent text messages with no answer until 5:14 p.m. At that time, Wife spoke to the victim. The victim told Wife that he had fallen and was injured. The victim sounded disoriented and confused, but said that prior to falling he had reached the summit of Santiago Peak and was returning home. At 5:32 p.m., Wife called the Trabuco Ranger Station, but no one answered. At 5:34 p.m., Wife called the Cleveland National Forest Service, but could not reach a human. At 5:36

2

p.m., Wife called 911 and spoke to an operator, who instructed Wife to wait at home for law enforcement.

At 6:30 p.m., Corona police arrived at the Family's residence. Wife told the police about the victim's injury, the victim's planned route, the amount of clothing he was wearing, and she provided photographs of the victim. At 8:00 p.m., Riverside County Sheriff's Deputy Zaborowski arrived at the Family's residence. Wife gave Deputy Zaborowski the same information that she had given to the Corona police officer. Deputy Zaborowski remained at the Family's residence for most of the evening. Deputy Zaborowski had Verizon ping the victim's cell phone, which revealed the victim's phone was near Santiago Peak. Verizon employees were working on a cell tower near Santiago Peak; the Riverside County Sheriff's Department (Sheriff's Department) asked the Verizon employees "to be vigilant for [the victim's] location."

Riverside County Sheriff's Lieutenant Zachary Hall was the "Incident Commander" for the case. Lieutenant Hall was not trained in search and rescue techniques. At 10:00 p.m., Lieutenant Hall or Riverside County Sheriff's Detective Holder arrived at the Family's residence and said "he was the Lieutenant 'in charge.' "[1] Lieutenant Hall spoke to Deputy Zaborowski outside. Lieutenant Hall said the victim was likely having an affair, implying that the victim was not missing but was with his girlfriend. Lieutenant Hall questioned why law enforcement needed to be involved.

---

[1] For ease of reference, and because the person (1) identified himself as a Lieutenant, and (2) said he was the person in charge, we will refer to the person as Lieutenant Hall.

3

Lieutenant Hall reentered the house and told Wife that the Sheriff's Department's search and rescue team would start searching for the victim in the morning.

Wife knew that temperatures on Santiago Peak would be in the 30s or 40s overnight. Wife asked Lieutenant Hall, " '[W]hat are the chances he dies of hypothermia?' " Lieutenant Hall replied that the victim "was 'a grown man' and that 'he can survive the night.' When further questioned about why the department was not searching given the dangers of the cold, [Lieutenant Hall] replied that 'if it was a child, [he] would send a helicopter out there right now."

On March 1, 2014, the Sheriff's Department had an "Off-Highway Vehicle Enforcement" team (ROVE) that was equipped with all-terrain vehicles. The vehicles were equipped with lights and could operate at night. The ROVE team was not dispatched to search for the victim on the night of March 1.

After the Sheriff's Department said it would delay its search until the morning of March 2, Wife organized six family members to search for the victim. The Sheriff's Department advised Wife "not to initiate any search on her own, and was told that the [the Sheriff's Department] would take care of that task." Nevertheless, at 3:45 a.m. on March 2, Wife and her family members began searching on foot for the victim.

Pat Killam was a member of the "Riverside Mountain Rescue Unit" (RMRU), a group of volunteer deputies trained to respond to wilderness emergencies. Killam was "contacted by another member of RMRU" after Lieutenant Hall decided to wait until the morning to search for the victim. Early in the morning on March 2, Killam awoke to search for the victim. During midmorning, before deputies began searching the roads

4

and trails, Killam, using a motorcycle, located the victim's body on Santiago Trail near Santiago Peak. Santiago Trail was a maintained fire access road that accommodates four-wheel drive or off-road vehicles. The victim had died of hypothermia.

The Family's first cause of action was for wrongful death. Sheriff's Department personnel told Wife "they would 'handle' the search, and requested that [Wife] not initiate any search on her own." Thus, the County assumed the responsibility of searching for the victim and rescuing him. Wife relied on the Sheriff's Department's search efforts because the Sheriff's Department "took control of the situation." The Sheriff's Department delayed the search in bad faith based upon its conclusion that the victim was not missing, but was having an affair. The victim "could have been rescued" if rescuers "used four wheel drive cars/trucks or other off road vehicles to access [the victim] who was lying on a maintained fire access road."

The Family's second cause of action was for negligence, and it included allegations similar to the wrongful death cause of action. The Family's third cause of action was for negligent infliction of emotional distress, and it included allegations similar to the wrongful death cause of action.

The Family's fourth cause of action was for a deprivation of constitutional rights. (42 U.S.C. § 1983.) The victim had a right to life and liberty under the 14th Amendment of the United States Constitution. The Sheriff's Department had trained search and rescue teams, such as the ROVE team; RMRU, which was a group of volunteer deputies trained for wilderness emergencies; and "Riverside County Search Dogs," a non-profit canine search and rescue organization.

5

Lieutenant Hall, who was placed in charge of the victim's case, was not trained in search and rescue techniques. Due to the lack of training, Lieutenant Hall was unable to formulate a proper search plan. Additionally, Lieutenant Hall was unaware of the County's resources that were available for search and rescue, such as the ROVE team. If Lieutenant Hall had been properly trained, he would have contacted the ROVE team so as to have the ROVE team assess the possible rescue options. Lieutenant Hall did not know the terrain of the Cleveland National Forest, he did not check the elevation of Santiago Trail, and he did not check the temperature at Santiago Peak to assess the danger of hypothermia.

Deputies were assigned to watch the trailheads, but those deputies had no search and rescue training. The deputies at the trailheads had four-door sedans that were unable to traverse off-road trails. If properly trained search and rescue personnel had been deployed on the night of March 1 to search in the area where the victim's cell phone was pinged, then he would have been found alive.

Further, the County was aware that its personnel were not properly trained in search and rescue techniques because, prior to March 1, 2014, a report was prepared by a sheriff's lieutenant and given to the Sheriff's Department executive team reflecting that relying on volunteer groups for search and rescue operations could lead to " 'failure.' " The County's failure to properly train personnel demonstrated a deliberate indifference to the rights of the public, and, in particular, the rights of the victim.

The Family sought general damages; special damages for medical expenses; loss of earnings for the financial support the Family would have received from the victim; funeral and burial expenses; costs; interest; and any other proper relief.

B.    DEMURRER

The County demurred to the SAC.  As to the first, second, and third causes of action, i.e., the negligence claims, the County asserted there was no duty to rescue another person.  Additionally, the County contended that a government agency can only be held liable for statutory violations.  The County asserted there was no statute mandating one person rescue another, absent a special relationship.  The County explained that a special relationship could be found if the County had taken affirmative actions that placed the victim in greater danger.  The County contended no facts were alleged that the County took affirmative actions that placed the victim in greater danger.

The "good Samaritan" rule is that liability can be found if a person affirmatively makes things worse, or if a person affirmatively induces reliance in a manner that causes injury.  The County asserted that the Family failed to allege any facts reflecting the County increased the danger to the victim.  The County asserted the Family was informed at 10:00 p.m. that the County would not be attempting to rescue the victim on March 1, and the County did not prevent the Family from attempting its own rescue on March 1.  In regard to the fourth cause of action, the County asserted there was no constitutional duty for the County to provide rescue services.

7

C.    OPPOSITION

The Family opposed the demurrer.  As to the first three causes of action, the Family asserted that, under the "good Samaritan" rule, a person who has undertaken a rescue can be held liable for performing the rescue in a negligent manner.  The Family asserted the County undertook the responsibility of rescuing the victim and therefore had a duty to perform the rescue with care.

As to the fourth cause of action, the Family asserted that a County can be held liable for a failure to train its law enforcement officers where the failure to train demonstrates a deliberate indifference to the public's rights.  The Family asserted that the County's failure to adequately train its officers in search and rescue techniques showed deliberate indifference.

D.    HEARING

The trial court held a hearing on the County's demurrer.  At the beginning of the hearing the trial court said, "In this case, there are no allegations that any County actor had contact with the [victim] or that any County actor did anything to put [the victim] in danger or to prevent qualified persons from performing a rescue.  Nor was [the F]amily prevented from undertaking their own efforts to rescue decedent.  [¶]  While it appears that [the victim's] chances of survival would have been greatly increased had the Sheriff's Department initiated the search the evening of March 1st, 2014, there are no allegations of affirmative actions that increased the danger to [the victim].  [¶]  . . . What [the Family] is arguing is that the Sheriff's Department acted negligently in failing to begin the search for [the victim] on the evening of March 1st, 2014.  However, the

8

County was under no general obligation to rescue [the victim]. [¶] Therefore, the Court will sustain the demurrer . . . without leave to amend. [¶] Court notes this is not a botched rescue case, where a rescue is begun and is performed negligently. In this case, the rescue was never actually begun."

The Family argued that the County did initiate a search on March 1. The Family contended that Lieutenant Hall was appointed as Incident Commander for the search, the victim's cell phone was pinged, and deputies were posted at different trailheads. The Family argued, "This is along the lines of going out to the scene, starting to tend to some of the injured victims and then bolting."

The trial court asked, "[D]oesn't the attempted rescue have to further endanger the decedent in this case? I mean we're looking at the relationship between the sheriff and the family, but nothing that they did actually put the [victim's] situation in any greater danger or peril, did it?" The Family replied that if the Sheriff's Department told the Family at 6:00 p.m. that deputies would not be searching for the victim until March 2, then the Family would have organized a volunteer search party earlier on March 1. The Family asserted, "[T]he County basically lulled the [Family] into a false sense of security by not responding in an appropriate fashion."

The court responded, "[T]hey did not prevent the family from going. They discouraged the family from going. Isn't that correct?" The Family replied, "But the allegations are the [Family] would have gone out there earlier if they had not been told by the County, 'Hey, we'll handle this search and rescue.' " The court replied, "I guess the whole issue boils down to a representation that, you know, you're not going to start

9

your rescue until the following morning, or, you know, let's hold off until 10. Is that an affirmative act? I don't think it's an affirmative act. You know, that's the problem. You know, I don't think a representation reaches the level—it's basically nonfeasance. They didn't do anything."

The Family contended that the County prevented others from rescuing the victim. The Family asserted that the affirmative acts were telling Wife not to conduct her own search and telling Wife, " '[W]e've got it handled.' " The County argued that the allegations in the SAC reflected the Family first had contact with a County employee at 8:00 p.m., and then, at 10:00 p.m., Lieutenant Hall said the search would take place the next day. The County argued that the comment " '[W]e will handle it' " was made by a 911 operator who was not a County employee.

The trial court said, "I'm going to stand by my ruling on the demurrer. I'm going to sustain without leave. [¶] You know, let's see what happens [at] the court of appeals."

## DISCUSSION

A.      STANDARD OF REVIEW

" 'We review de novo the trial court's order sustaining a demurrer.' [Citation.] In doing so, this court's only task is to determine whether the complaint states a cause of action. [Citation.] We accept as true all well-pleaded allegations in the operative complaint, and we will reverse the trial court's order of dismissal if the factual allegations state a cause of action on any available legal theory." (*Brown v. Deutsche Bank National Trust Company* (2016) 247 Cal.App.4th 275, 279.)

10

B.    WRONGFUL DEATH

1.    *CONTENTION*

The Family contends the trial court erred by sustaining the demurrer to the wrongful death cause of action.

2.    *LAW*

The elements of a wrongful death cause of action are "(1) a 'wrongful act or neglect' on the part of one or more persons that (2) 'cause[s]' (3) the 'death of [another] person.' " (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 390.)  The elements of negligence are " ' "a legal duty to use due care, a breach of such legal duty, and the breach as the proximate or legal cause of the resulting injury." ' " (*Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1083.)

3.    *DUTY*

"As a general rule, a person who has not created a peril has no duty to come to the aid of another 'no matter how great the danger in which the other is placed, or how easily he could be rescued, unless there is some relationship between them which gives rise to a duty to act.  [Citations.]'  [Citation.]  This rule applies to police officers as well as to other citizens:  The police owe duties of care only to the public at large and, except where they enter into a 'special relationship,' have no duty to offer affirmative assistance to anyone in particular." (*Benavidez v. San Jose Police Dept.* (1999) 71 Cal.App.4th 853, 859-860.)

A special relationship can be found "when the state, through its agents, voluntarily assumes a protective duty toward a certain member of the public and

11

undertakes action on behalf of that member, thereby inducing reliance, it is held to the same standard of care as a private person or organization." (*Williams v. State of California* (1983) 34 Cal.3d 18, 24 (*Williams*).) One who voluntarily comes to the aid of another "is under a duty to exercise due care in performance and is liable if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking." (*Id.* at p. 23.)

In the SAC, the Family alleges that, on March 1, the Sheriff's Department (1) pinged the victim's cell phone, which led to the discovery that the victim's cell phone was on Santiago Peak; (2) collected information about the victim from Wife; (3) instructed Verizon personnel to "be vigilant for [the victim's location]"; (4) placed deputies at trailheads; (5) set a time to start searching the area for the victim; and (6) appointed an Incident Commander. In other words, the Sheriff's Department was at the victim's house, at the trailheads, talking to people in the area, and making search plans.

Assuming the foregoing facts are true, the Sheriff's Department, through its actions, undertook the responsibility of rescuing the victim because the Sheriff's Department was actively involved in all aspects of locating the victim, and by appointing an Incident Commander, the Sheriff's Department signaled that it was taking control of the rescue. Therefore, the Sheriff's Department had the duty to exercise due care in performing the rescue, which means (a) using reasonable care not to increase the risk of harm, and (b) following through in a reasonable manner after inducing reliance on the rescue.

In regard to detrimental reliance, the following is illustrative: "A special relationship based on . . . dependency was found in *Mann v. State of California* [(1977)] 70 Cal.App.3d 773. Highway patrolmen, coming to the aid of a stranded motorist, placed their car with flashing lights behind two cars stalled on the freeway. After calling the tow truck, the officers withdrew without warning; they did not wait for the tow truck to line up behind the stalled car or provide the alternative protection of flares. Minutes later the stalled car was sideswiped by a passing car and the persons nearby were injured. In *Mann*, the officers' conduct contributed to, increased, and changed the risk which would have otherwise existed. They stopped to investigate and they took affirmative steps to provide assistance, lulling the injured parties into a false sense of security and perhaps preventing other assistance from being sought.

"Although the Legislature viewed *Mann* as dangerously extending the liability of peace officers while engaged in activities not involving law enforcement—i.e., while rendering assistance to stranded motorists not involved in accidents—the case is no more than the application of the duty of care attaching to any volunteered assistance." (*Williams*, *supra*, 34 Cal.3d at pp. 25-26.)

We examine whether the SAC alleges that the County induced reliance on its rescue efforts. The SAC provides, "When told of the Sheriff's department refusal to look for [the victim], [Wife] attempted to organize family members to try to start their own search. [Wife] gathered six other family members and set out on foot about 3:45 a.m. Sunday from Corona toward Santiago Peak in the Santa Ana Mountains. They split up into twos and threes, carrying flashlights and other equipment."

13

Wife did not organize her own search team until after learning that the County would be delaying its efforts. That Wife did not start her efforts until hearing of the County's delay suggests Wife was relying on the County's search efforts. Accordingly, the Family has sufficiently pled that the County undertook rescue efforts and induced reliance on those efforts.

In sum, the trial court erred by ruling the County did not owe a duty of care. The County's demurrer to the negligence-based causes of action was focused solely upon the argument that the County bore no duty; the County did not argue the issues of breach, causation, and damages. Therefore, we do not address the remaining negligence elements of breach, causation, and damages. (See e.g., *Dutra v. Eagleson* (2006) 146 Cal.App.4th 216, 230 ["because that ground was never raised in [the] demurrer, we cannot rely on it and must reverse"].) We will reverse the judgment as to the wrongful death cause of action.

C.     <u>NEGLIGENCE</u>

The Family contends the trial court erred by sustaining the demurrer to the negligence cause of action. We have analyzed the issue of duty *ante*, within the wrongful death cause of action. We have concluded *ante* that the trial court erred by ruling that no duty was owed. Accordingly, we will reverse the judgment as to the negligence cause of action.

D.     <u>NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>

The Family contends the trial court erred by sustaining the demurrer to the cause of action for negligent infliction of emotional distress (NIED). " '[T]he negligent

14

causing of emotional distress is not an independent tort, but the tort of negligence. [Citation.] The traditional elements of duty, breach of duty, causation, and damages apply.' " (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1072.)

In the SAC, within the NIED cause of action, the Family alleges, "Defendants, and each of them, owed a duty of care to Plaintiffs' Decedent, with respect to the manner in [which] they conducted the search and rescue operations." Thus, the NIED cause of action relies upon the County's duty to conduct the search with reasonable care. (See generally *Huggins v. Long Drug Stores California, Inc.* (1993) 6 Cal.4th 124, 129-130 [discussing direct and bystander liability, and the respective duties owed, in NIED claims].) We have analyzed that issue *ante*, and concluded the trial court erred in ruling that no duty was owed. Accordingly, we will reverse the judgment as to the NIED cause of action.

E.       DEPRIVATION OF CIVIL RIGHTS

The Family contends the trial court erred by sustaining the demurrer to the cause of action for a deprivation of constitutional rights (42 U.S.C. § 1983), which was in the form of a *Monell* claim. (*Monell v. Department of Social Services of City of New York* (1978) 436 U.S. 658.)

*Monell* provides that a governmental entity may only be held liable where the entity causes a constitutional violation. To establish *Monell* liability, " 'a plaintiff must "identify the challenged policy, [practice, or custom,] attribute it to the [county] itself, and show a causal link between the execution of the policy, [practice, or custom,] and the injury suffered." ' [Citation.] In addition, plaintiffs must 'present scienter-like

15

evidence of indifference on the part of a particular policymaker or policymakers.' [Citation.] The requirement of producing scienter-like evidence on the part of an official with policymaking authority is consistent with the conclusion that 'absent the conscious decision or deliberate indifference of some natural person, a [governmental entity], as an abstract entity, cannot be deemed to have engaged in a constitutional violation by virtue of a policy, a custom or failure to train. [Citation.] '[I]n the absence of any unconstitutional statute or rule, it is plaintiffs' burden to articulate a factual basis that demonstrates considerably more proof than a single incident.' " (*Beswick v. City of Philadelphia* (E.D. Penn. 2001) 185 F.Supp.2d 418, 427.)

In the Family's SAC they cite Government Code section 26614, which provides, in relevant part, "The Board of Supervisors of a county may authorize the Sheriff to search for and rescue persons who are lost or are in danger of their lives within or in the immediate vicinity of the county." The Family alleged that the Riverside County Board of Supervisors authorized the Sheriff's Department to provide search and rescue services.

The Family asserted that the Sheriff's Department does not have any personnel trained in search and rescue operations; rather, they have access to volunteer deputy units, such as ROVE and RMRU. The Family contended Lieutenant Hall and the deputies assigned to the trailheads did not have search and rescue training. Also, Lieutenant Hall was unaware that ROVE could operate off-road vehicles in the dark, such that they could have searched for the victim on the night of March 1.

16

The Family alleged that the County "developed, implemented, enforced, encouraged and sanctioned de facto policies, practices, and/or customs regarding 'search and rescue' operations. However, Defendant COUNTY failed to train its 'search and rescue' personnel, and/or the need for more or different training was so obvious such that the inadequacy of the training demonstrated that the County was deliberately indifferent to the needs of members of the public, such as [the victim], that the constitutional rights which caused the violation of such rights [*sic*]."

Prior to March 1, 2014, Sheriff's Department Lieutenant Robert Perdue of the Sheriff's Emergency Response Team sent a report to Chief Alm and the Sheriff's Department executive team recommending the creation of a " 'Search Management and Rescue Team (SMART) staffed with collateral duty sworn personnel as other agencies' [*sic*] and to issue directives to ensure the SMART was trained, certified and equipped to conduct search and rescues in Riverside County."

The Family's allegations continued, "The Report states that there are no sworn Riverside Sheriff['s] Department personnel to conduct search and rescues in Riverside County and that such operations have been handled by 'volunteer groups and reserve deputies under individual stations.' The Report further provides: [¶] 'Since their policies and procedures differ greatly between groups/stations, there is often a significant lack of consistency in training and operating. The lack of consistency and proactive management of these personnel creates a host of issues for the department and individual volunteers and reserves. Volunteer groups and reserve deputies are designed to function out of individual stations to accommodate the volunteer's [*sic*] travel to and

17

from assignments. The problem breaks down when a station volunteer coordinator is tasked with supervising these programs with little direction and in some cases little desire. Couple this with lack of coordination between the stations and training coordinators at BCTC and there is a recipe for overall failure.' "

The Family alleged, "The Report also stated that availability of volunteer search and rescue teams had come into question and the search and rescue call outs yielded low or inadequate responses." Further, "The Report also claimed that the Sheriff's Department handled 539 Search and Rescue calls for service with 237 calls in 2013, 187 calls in 2012 and 115 calls in 2011. Local counties with mountain ranges such as Los, Angeles, San Diego and San Bernardino Counties already had 'sworn personnel trained for search and rescue incidents' just in case volunteers did not show up." The Family alleged that despite the warnings in the report, the County failed to staff the Sheriff's Department with personnel trained in search and rescue techniques.

The Family alleged, "The COUNTY's failure to train its employees in relevant respects evidences a 'deliberate indifference' to the rights of the public, like [the victim], such that the shortcomings of the training are/were properly thought of as a city 'policy or custom' that is actionable under § 1983."

The Family's *Monell* claim fails because it does not allege facts supporting a finding of deliberate indifference. The Family's allegations reflect there was a report calling for search and rescue training for deputies and warning of relying on a mixture of volunteer groups to conduct searches. However, the Family's allegations reveal hundreds of searches were conducted in Riverside County, and the Family fails to allege

18

any problems with those searches. As a result, it is difficult to conclude the County was indifferent to the lack of training. Hypothetically, if there had been 10 prior search and rescue operations that failed due to the lack of trained personnel, then that might tend to show deliberate indifference, but no such allegations are made in the SAC.

Further, in the SAC, the Family alleges that the victim was found by Killam, "who had been contacted by another member of RMRU." Thus, the allegations in the SAC imply that someone at some point contacted RMRU, and at least one member of RMRU, i.e., Killam, responded. In sum, the SAC reflects that hundreds of rescues have occurred in the County. No problems are alleged as to those prior rescues. In the instant case, the volunteer group that was trained for search and rescues was contacted, and one of the volunteers ultimately found the victim's body. These allegations do not reflect a policy that was instituted or maintained due to deliberate indifference to the rights of citizens. Accordingly, the trial court did not err by sustaining the demurrer to the fourth cause of action.

F.     LEAVE TO AMEND

" 'Where the complaint is defective, "[i]n the furtherance of justice great liberality should be exercised in permitting a plaintiff to amend his complaint, and it ordinarily constitutes an abuse of discretion to sustain a demurrer without leave to amend if there is a reasonable possibility that the defect can be cured by amendment. [Citations.]" ' [Citations.] This abuse of discretion is reviewable on appeal 'even in the absence of a request for leave to amend' [citation], and even if the plaintiff does not

19

claim on appeal that the trial court abused its discretion in sustaining a demurrer without leave to amend." (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 970-971.)

The problems in the *Monell* claim are factual. The Family fails to explain how it will amend the SAC to reflect deliberate indifference by the County. Because the Family has not proposed allegations for an amendment, we conclude the trial court did not err by denying leave to amend the *Monell* claim.

## DISPOSITION

The judgment is reversed as to the causes of action for wrongful death, negligence, and negligent infliction of emotional distress. In all other respects, the judgment is affirmed. The parties are to bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)

CERTIFIED FOR PUBLICATION

MILLER _____
                                                J.

We concur:

McKINSTER _____
                  Acting P. J.

FIELDS _____
                  J.

20