Filed 3/29/22

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| NICHOLAS BROWN, a Minor, etc., | C088204 |
| Plaintiff and Appellant, | (Super. Ct. No. PC20160401) |
| v. | |
| EL DORADO UNION HIGH SCHOOL DISTRICT, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of El Dorado County, C. Anders Holmer, Judge. Affirmed.

Dreyer Babich Buccola Wood Campora, Roger A. Dreyer, Robert B. Bale; and C. Athena Roussos for Appellant Nicholas Brown by and through his Guardian ad Litem Laurie Brown for Plaintiff and Appellant.

Horvitz & Levy, Steven S. Fleischman, Scott P. Dixler; Schuering Zimmerman & Doyle, Robert H. Zimmerman, Keith D. Chidlaw; Matheny, Sears, Linkert & Jaime, and Matthew C. Jaime for Defendant and Respondent.

1

SUMMARY OF THE APPEAL

Plaintiff Nicholas Brown (Nick), through his mother and Guardian ad Litem Laurie Brown (Laurie), brought a personal injury action against defendant El Dorado Union High School District (the District) after Nick suffered a traumatic brain injury during a football game.

After the District brought a summary judgment motion, the trial court granted summary judgment in favor of the District on two grounds. First, the trial court found the case was barred by the affirmative defense of an express assumption of risk due to a release and waiver Nick and his father, Read Brown (Read), signed prior to the football season. Second, the court found the action was barred by the principle of the primary assumption of risk.

Nick now appeals, challenging the trial court's decision to accept a less-than-perfect separate statement of undisputed material facts (separate statement) filed by the District, evidentiary rulings, and the substance of the trial court's ruling on the motion for summary judgment. We find the trial court acted within its discretion in accepting the separate statement, Nick has failed to sufficiently develop his arguments regarding the court's evidentiary rulings, and summary judgment was proper due to the Browns' express assumption of the risks associated with Nick's participation in the football program. Accordingly, we affirm.

FACTS AND HISTORY OF THE PROCEEDINGS

*Nick Brown*

In August 2015, Nick was a sophomore at Union Mine High School and played on the junior varsity football team. Union Mine is a high school within the District.

*Release and Related Documents*

According to Jay Aliff, the Athletic Director for Union Mine High School, prior to the 2015-2016 academic year, every student who wished to participate in extracurricular athletics was to receive an athletic handbook from their coach or Aliff's office. According to a cover letter included in the handbook, "[t]he following information in this Extracurricular Athletic Handbook must be read, reviewed, and agreed upon by your student athlete."

Included with that handbook was an "El Dorado Union High School District Release of Liability and Assumption of Risk Agreement [for] Athletics & Cheer/Stunt." Prior to the start of the 2015-2016 football season, Nick and his father signed this form. The release states, "my son . . . may participate in the school-related activities designated above." Someone checked the boxes for baseball and football on the release Read and Nick signed.

The release provides that if Nick "is hurt, injured, or even dies, I/we (i.e., the student, his/her parent/s, guardian/s, heir/s . . .) will not make a claim against or sue the El Dorado Union High School District (hereinafter EDUHSD), its trustees, officers, employees, and agents, or expect them to be responsible or pay for any damages."

The release included the following:

"I, the undersigned, understand and acknowledge that the above-named student has voluntarily chosen to participate in school-related activities at his/her own risk. I/We know and fully understand that said school-related activities may involve numerous risks, dangers, and hazards, both known and unknown, where serious accidents can occur, and where participants can sustain physical injuries, damage to their property, or even die. Regardless of whether the school-related activity involves physical contact or not, any activity may have inherent risks of injury which are inseparable from the activity. I/We

3

acknowledge and willingly assume all risks and hazards of potential injury, paralysis, and death in the school-related activity/ies . . . .

"I/We, the undersigned, understand and acknowledge that school-related activity/ies contain potential risks of harm or injury. Injuries might arise from the student's actions or inactions, the actions or inactions of another student or participant, or the actual or alleged failure by district employees, agents, or volunteers to adequately coach, train, instruct, or supervise. . . . Injuries might also arise from undiagnosed, improperly diagnosed, untreated, improperly treated, or untimely treated actual or potential injuries, whether or not caused by the student's participation. All such risks are deemed to be inherent to the student's participation in school-related activities.

"In consideration for EDUHSD, allowing the above-named students to participate in the school-related activity/ies specified above, I/we voluntarily agree to release, waive, discharge, and hold harmless the EDUHSD and its trustees, officers, employees, and agents from any and all claims of liability arising out of their negligence, or any other act or omission which causes the above-named student illness, injury, death or damages of any nature in any way connected with the student's participation in the school-related activity/ies. I/We also expressly agree to release and discharge EDUHSD, its trustees, officers, employees, and agents from any act or omission of negligence in rendering or failing to render any type of emergency or medical services.

"As parent or legal guardian of the student/participant under 18 years of age, I have read and voluntarily agree that my son/daughter may participate in the school-related activity/ies designated above and I sign this release on his/her behalf. In signing this document I fully recognize and understand that if my son/daughter is hurt, dies, or his/her property is damaged, I am giving up my right and the right of his/her heirs to make a claim or file a lawsuit against the EDUHSD, its trustees, officers, employees, and agent[.]

4

**"By signing below, I/we acknowledge that I/we: (1) have read this document and understand that I/we give up substantial actual or potential rights in order to allow the above-named student to participate in the school-related activity/ies and any associated field trip or excursion; (2) have voluntarily signed as evidence of acceptance of this Agreement without any inducement or assurance of any nature, with full appreciation of the all [*sic*] risks inherent in the school-related activity/ies; (3) have no question regarding the scope or intent of this Agreement and I (parent/guardian/non-minor student) have the right and authority to enter into this Agreement and to bind myself, the student, and any other family member, personal representative, assign, heir, trustee, or guardian to the terms of this Agreement. This is a release of all claims."** (Original boldface.)

Read's signature on the release was sufficient to bind Nick to its terms. (*Eriksson v. Nunnink* (2015) 233 Cal.App.4th 708, 721 ["courts have held that the right to disaffirm a minor's contract does not extend to a release of liability signed by a parent on behalf of the minor"].)

Also included with the handbook was a Parent Concussion/Head Injury Information Sheet that described the protocol for removing a student athlete from and then returning the student to practice and/or competition when the student athlete was suspected of sustaining a head injury. The form indicates concussion injuries "can lead to . . . severe brain swelling . . . with devastating and even fatal consequences." Read and Nick signed this form, and dated it the same date as the release.

According to Aliff, the packet with the forms and handbook also included a sheet entitled "Parent Concussion/Head Injury Symptoms & Signs." The form stated concussions could be caused "by a bump, blow, or jolt to the head, or by a blow to another part of the body with the force transmitted to the head."

In his deposition, Nick recalled receiving the handbook at least twice, including once the summer before his sophomore year. Laurie testified she saw a handbook at the

5

beginning of each school year when Nick and his elder brother played sports. She acknowledged her sons would give her the handbook along with forms that needed to be signed, including the one about concussions.

*California Interscholastic Federation (CIF) Recommendations*

"The California Interscholastic Federation is a voluntary organization that consists of school and school-related personnel with responsibility for administering interscholastic athletic activities in secondary schools." (Ed. Code, § 33353, subd. (a).)

In their filings below, the parties agreed that the California Interscholastic Federation published a 2015-2016 Constitution and Bylaws (CIF Bylaws) that applied to Union Mine High School, and a 2011 Sports Medicine Handbook (CIF Medicine Handbook). They also agreed that the Sac-Joaquin section of the California Interscholastic Federation published its own 2015-2016 Constitution and Bylaws (SJ CIF Bylaws), which also applied to Union Mine High School.

The Game Management Guidelines contained in the CIF Bylaws "recommended" that school administrative staff "[p]rovide first-aid capability and/or medical doctor availability as needed" at school athletic competitions. The SJ CIF Bylaws provided that, for football games, "[t]he home team shall endeavor to have a doctor at the game." The CIF Medicine Handbook also recommended as part of its section on emergency-preparedness on its bulletin on "Reducing Head and Neck Injuries in Football" that, "[i]f possible, a physician and/or EMT should be present for all games/practices."

Throughout the CIF Medicine Handbook, various sections flag concussion symptoms to watch for in student athletes. The Sports Medicine Bulletin on Reducing Head and Neck Injuries in Football, the Concussion Fact Sheet for Coaches, the Concussion Fact Sheet for Student-Athletes, and the Concussion Fact Sheet for Parents/Guardians identified symptoms like loss of consciousness, inability to walk normally/balance problems or dizziness, disorientation/confusion, and memory

6

loss/memory problems as symptoms of a concussion. None of them identified unequal pupil size as a symptom to watch for that would trigger a suspicion that a student athlete was concussed.

### *Coach Training & Testimony Regarding Lessons Learned*

California law reflects an intention that school districts emphasize the importance of training school coaches in "a basic understanding of the signs and symptoms of concussions . . . and the appropriate response to concussions  . . . ." (Ed. Code, § 35179.1, subd. (c)(6).) The CIF Bylaws require member schools to "[e]nsure that all coaches, paid and unpaid, will have completed a coaching education program that emphasizes . . . [t]raining:  certification in CPR first aid, that includes training in signs and symptoms of concussions . . . ."

Nick's coaches completed concussion training.

On the motion, Nick submitted a copy of what appear to be slides or educational materials used in the training. Both parties cite to these materials to support their statements regarding what coaches learned in training. The introduction to the training indicates "medical researchers have discovered young athletes, especially kids and teens, often don't recognize their own limitations; especially when they have a concussion." "It's your responsibility, as a coach, to help recognize and make the call to pull an athlete off the field, ice, or court if you think that player might have a concussion." There are a series of five lessons.

The first lesson advises about the seriousness of concussions, and explains that "[e]ven what may seem like a mild bump to the head can actually be serious." It also instructs that most concussions occur without loss of consciousness.

The second lesson focuses on concussion symptoms for coaches to watch for. It tells coaches to "watch for and ask others to report the following two things among your athletes:  [¶]  (1) A forceful bump, blow, or jolt to the head or body that results in rapid

movement of the head.  [¶]  *—and—*  [¶]  (2) Any concussion signs or symptoms, such as a change in the athlete's behavior, thinking, or physical functioning."  (Original boldface italics.)  The list of symptoms that coaches and/or athletes might observe that could give rise to a suspicion an athlete suffered a concussion track those identified on the Fact Sheets contained in the CIF Medical Handbook.  For example, the list includes items like "[a]ppears dazed or stunned," "[i]s confused about assignment or position," "[m]oves clumsily," and "[c]oncentration or memory problems."  "One pupil larger than the other" is listed among the "[d]anger [s]igns" that may occur in some "rare cases."  Though the training does advise coaches to call 9-1-1 if they observe a danger sign, not all danger signs—including unequal pupils—are included on the list of the first signs for coaching staff to watch for while monitoring the game.

The third lesson describes steps to take once a coach suspects an athlete has suffered a concussion, and the fourth explains why it is important to reintegrate a student athlete into playing a sport gradually after a concussion.

The fifth and final lesson contains recommendations for steps to take before, mid, and after an athletic season.  The pre-season recommendations include taking steps to educate athletes, parents, and other staff about concussions.  Identified means for educating others include dedicating a team meeting to talk about concussion before the first practice; talking to parents, athletes, other coaches, and league and school officials about the dangers of concussions and expectations of safe play; showing concussion videos, and passing out fact sheets; and reminding athletes and staff to immediately report to coaching staff if they suspect they or a teammate has a concussion.

During his deposition, Matthew Cathey, head coach of the junior varsity football team, testified that, based on his training, when players were on the field and when he spoke with them he would want to look at the "[e]xpression in their face. . . .  The blank look.  Speech, I talk to them, they're talking to me, talking back to me.  Awareness, where they're at, what's going on.  Speed of play.  If they're still explosive, still charging

8

the way I'd expect them or have seen them; the way they execute. We're pretty particular about what foot to step with in different positions. If I see them stepping with the wrong foot and I know that they—you know, the coach didn't have them doing it properly, I'd be looking for those things. The way they communicate and interact with their teammates and officials." He said during timeouts he will use the time to evaluate the players, "look at them, who needs to come in and who needs to come out. I'm looking them in the eye and expecting them to look at me in the eye." He admitted he understood that eyes not tracking together or differently dilated pupils could be a sign of a concussion or brain injury if you look in a person's eyes. However, it was his understanding that looking at pupils was the sort of thing he should do if he had seen other symptoms to alert him to a concussion. If a player were to show symptoms of confusion, unsteady feet; an inability to play the play, or to know what direction to go; "[i]f we're running . . . a dive to the right and he goes to the left. If he gets up and goes to the wrong huddle, things like that," then Cathey would say, " 'hey, come over here and let me take a look at you,' then I would look closer at his eyes and determine—and try to look and see if we have something more serious going on." According to his declaration, Cathey believes the training he used was developed in partnership with the Centers for Disease Control.

Assistant coaches Michael Scott and Keith Pearman provided deposition testimony that, based on their training and prior experience with concussed persons, they would look for similar symptoms of concussions in athletes—i.e., unsteady gaits/staggering, slurred speech, confusion, and dazed looks.

In declarations submitted in support of the motion for summary judgment, the coaching staff said that their training did not instruct them to perform a detailed individual assessment of each player after each play regardless of whether the players were showing signs of concussion, but rather it instructed them to generally be on the lookout of signs of concussion throughout the game.

9

*Concussions and General Safety Advisories*

The "Parent Concussion/Head Injury Symptoms & Signs" sheet included with the handbook and forms listed concussion symptoms that were consistent with those listed on the "Concussion Fact Sheet" for coaches, student-athletes, and parents contained in the CIF Medicine Handbook—e.g., balance problems or dizziness, memory problems, appearing dazed, slurred speech, and clumsy movement.

In his declaration, Cathey stated that, before the season began, he told all players they should signal for a substitution if they felt they were not performing at their best during a game. Additionally, he told players not to continue playing if they believed they were injured and to communicate their injuries and potential injuries. Declarations made by the assistant coaches reiterated that Cathey gave these advisories.

Nick submitted declarations by himself and a teammate indicating that pregame talks never specifically discussed concussions or concussion symptoms. Both students said they thought that, when they were told they could signal to leave a game, that the coaches meant they could signal if they suffered something like a muscular or skeletal injury.

*Game Day Events*

Nick suffered the brain injury that is the basis for this suit on August 28, 2015, when the Union Mine junior varsity football team played a non-league game at Union Mine High School. Though the parties did not identify all of the positions Nick played, according to Cathey, Nick played quarterback for some plays during the game. Andrew Middleton, the offensive line coach, believes Nick played some plays as a receiver and running back, and played kickoff on special teams.

Michael D. Aveni, D.C., a chiropractor, attended the game. Aveni said in his deposition that he has some professional training on evaluating patients for traumatic brain injuries and concussions. During his deposition, Aliff stated he tried to find a

10

medical doctor to attend the game, but the one medical doctor had not responded when Aliff emailed him. Aliff admitted he probably could have tried reaching the medical doctor on the phone, but did not.

The District filed a declaration of Andrew Gregory with their moving papers. According to his declaration, Gregory was an employee of the El Dorado Fire Protection District with an EMT Certification on the date of the game. He says he attended the entire game. He brought a pickup equipped with "basic first aid and life support equipment, such as bandages, an oxygen mask, and airway devices."

Nick played every play of the game until sometime in the fourth quarter when he chose to leave the playing field. Based on game footage, Nick's last play appears to have been the 97th out of 100 plays in the game. During the play, Nick was tackled by another player, but it does not appear he took a direct blow to the head or that the tackle was particularly forceful. During prior plays, it appears possible Nick took a bump to the head, but none of his tackles or falls appear particularly forceful. Though there is no continuous footage between the plays in evidence, Nick does not appear unbalanced or uncoordinated in any of the game play video. No one approached Nick or performed a close evaluation of him when he sat down after taking himself out of the game.

Five to ten minutes after Nick took himself out of the game, the game ended. During his deposition, Cathey testified that as the players were lining up for a handshake with the other team, he heard a kid slur the word "coach." He turned, and Nick had fallen towards him. Aveni approached Nick to examine him. According to Aveni, Nick was partially conscious and confused. He was perspiring and given "the weather that day," Aveni believed that the heat was an obvious possible cause of Nick's condition. Aveni initially planned to evaluate Nick for heat exhaustion. Aveni poured water over Nick's body and tried to cool him down over his scalp, but he quickly realized Nick could not answer questions. Aveni testified he noticed there "was some cognitive dysfunction. And that the unintentional clonus or movement of his hand, to me, meant immediately

11

that there was something neurologic happening." Aveni announced to the coach and others that there was a neurological issue.

Aveni told Gregory they needed a unit for transport. Aveni testified at his deposition that Coach Cathey recommended putting Nick on a golf cart to get him to the front of the school immediately and Aveni agreed. In his declaration, Gregory indicates he radioed for an ambulance within minutes of Nick's collapse. At his deposition, Nick's father estimated it took 10 minutes from the time Nick collapsed for an ambulance to arrive.

According to postoperative notes filed with Nick's opposition papers, Nick came into the hospital with a larger left pupil than his right pupil. His surgeon concluded he suffered a large left subdural hematoma with midline shift and cerebral herniation, which was treated with an emergency decompressive surgery and evacuation of the subdural hematoma.

In June 2016, James Martel, M.D. began treating Nick for his injury. Martel submitted a declaration in which he stated he believed Nick suffered an optic nerve pallor in his left eye as a result of the injury. He declared that the injury would have happened simultaneously at the time of traumatic brain injury. He further averred that had someone with "appropriate training as to potential head injury" examined Nick, "it would have been immediately noticeable that his left eye would have been dilated."

### *District Deposition Testimony & Declarations Regarding Nick at the Game*

As part of its moving papers, the District submitted excerpts from deposition testimony and declarations from coaches who coached the team the day of the game.

Cathey recalled he spoke with Nick at least twice during the game: once at halftime and during a timeout. He evaluated Nick when he spoke with him and Nick did not show signs of head injury. Nick was talking and acting like he normally did. During the game, Cathey says he watched all offensive plays and most defensive plays. He

12

watched for signs of injury, including head injury. He did not see any signs of injury in Nick before he collapsed, and he did not see Nick take hits to the head that looked capable of injuring him. Cathey said Nick exhibited no distress and no issues when he came out of the game, and in his declaration, Cathey noted players who leave the game late in the game do so more often due to exhaustion rather than injury. Cathey testified, that when Nick left the game Cathey was standing on the sidelines, looking onto the field and he looked Nick in the eye from a distance of 10 to 20 yards. Cathey saw nothing out of the ordinary when Nick took himself off the field. Based on his training, Cathey did not see a need to evaluate Nick further and he never examined Nick's pupils. Cathey stated in his declaration that Nick never reported he was injured or might be injured. Cathey stated that if Nick had said he was injured or if Cathey had seen Nick injured, Cathey would have approached Nick to assess him. Cathey said the first indication that Nick had suffered a brain injury was when Nick collapsed at his feet, five to ten minutes after Nick left the game, when players were lining up for the handshake.

The deposition testimony and declarations submitted by the team's assistant coaches are consistent with the deposition and declaration testimony supplied by Cathey. Assistant Coach Keith Pearman also recalled speaking with Nick during halftime and that Nick seemed fine when they spoke; Nick was neither dazed nor confused. Assistant Coaches Pearman, Middleton, and Scott all submitted declarations declaring they watched many of the plays in the game, and monitored players for signs of injury, including head injury. None of the three assistant coaches recalled seeing any signs of injury to Nick prior to his collapse, and none saw Nick take a hit to the head that looked capable of injuring him. Middleton saw Nick leaving the game and did not see anything unusual about Nick at that time. The assistant coaches said that if they had seen Nick injured, or if Nick or someone had told them he was injured, they would have gone to Nick to assess him. All three agreed players who take themselves out of the game in the fourth quarter usually do so because they are tired rather than due to an injury.

13

Initially, the hearing on the motion for summary judgment was set for July 20, 2018. However, "[t]he day prior to the hearing, the court issued a tentative ruling which suggested that in light of certain objections made by each side, the District's Separate Statement of Undisputed Material Facts ('SSUMF') should be redone in several aspects, and several declarations from Nicholas Brown should be redone to avoid potential objections regarding lack of foundation and lack of authentication. Suffice it to say, the suggestion was not met with wild enthusiasm. The court took the matter under submission . . . ."

In the final ruling following the July 20, 2018, hearing, the court allowed the motion to proceed despite the weaknesses in the SSUMF, reasoning, "[t]he court understands that strict compliance with the statute is required. (*Bahl v. Bank of America* (2001) 89 Cal.App.4th 389, 394-395.) That said, the court finds the District's SSUMF has substantially complied with the statute. The style may have made the opposition's and the court's analysis more difficult, but the statute has been adequately met as the style did not preclude the ability to substantively consider and respond to the District's SSUMF."

As for the objections made by the District regarding Nick's evidence, the court concluded, "[t]he District has objected to several statements in Brown's opposition, claiming lack of authentication and/or foundation. . . . The District generally objects to any expert opinion based upon certain medical records in Brown's Appendix of Exhibits. Citing *Garibay v. Hemmat* (2008) 161 Cal.App.4th 735, the District objects on the basis that the medical records are not before the court due to lack of authentication. The key exhibits are Exhibits 19-21 to Brown's Appendix of Evidence. [¶] The court sustains the objections to Exhibits 19-21 as there is inadequate authentication for those records. . . . This ruling will cause the court to sustain certain of the District's objections to expert

14

witness declarations. However, those rulings will occur in the tentative ruling associated with the hearing on August 9, 2018."

In its final ruling on the motion for summary judgment, the court overruled all of Nick's objections, overruled some of the District's objections, and sustained some of the District's objections consistent with its ruling following the initial hearing. The portions of the declarations that remained in evidence when the court considered the motion for summary judgment will be addressed as relevant in the discussion below.

DISCUSSION

I

*Issues Regarding Evidence and the Separate Statement*

Before considering the merits of this appeal, we dispense with the two arguments advanced by Nick under the combined heading "The Court Erred in its Evidentiary Rulings."

A.     *The Trial Court Did Not Err in Accepting the District's Separate Statement of Undisputed Facts.*

When a party files a motion for summary judgment, "[t]he supporting papers shall include a separate statement setting forth plainly and concisely all material facts that the moving party contends are undisputed. Each of the material facts stated shall be followed by a reference to the supporting evidence. The failure to comply with this requirement of a separate statement may *in the court's discretion* constitute a sufficient ground for denying the motion." (Code Civ. Proc., § 437c, subd. (b)(1), italics added; see also *Truong v. Glasser* (2009)181 Cal.App.4th 102, 118 [finding the court's power to deny a motion for summary judgment due to failure to comply with formatting requirements is "discretionary, not mandatory"].)

Though Nick argues that the District's separate statement places an "extremely difficult burden on [him] to attempt to determine which fact was supported by which

evidence, impairing his ability to defend against the motion," he neither offers specific examples in his briefing as to where the difficulty lies or created a specific difficulty, nor does he argue he was ultimately prevented from making his arguments or identifying the evidence available to support his arguments. Additionally, Nick does not argue that pertinent evidence and facts were omitted from the District's motion papers in general or even in the separate statement specifically. Rather, Nick's position is that the District's separate statement was faulty "because it combined numerous facts together into single undisputed material facts, and did not separately identify which evidence pertained to which fact."

"The statute" governing the format of summary judgment moving papers, "is permissive, not mandatory: '[f]acts stated elsewhere [other than in the separate statement] *need not be* considered by the court [citation] . . . .' (*Fleet v. CBS, Inc.* (1996) 50 Cal.App.4th 1911, 1916, fn. 3, italics added.) Whether to consider evidence not referenced in the moving party's separate statement rests with the sound discretion of the trial court, and we review the decision to consider or not consider this evidence for an abuse of that discretion." (*San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 315-316, original italics.) In *Truong v. Glasser, supra,* 181 Cal.App.4th at page 118, the Fourth District Court of Appeal considered a plaintiff's argument that a "motion for summary judgment should have been denied because [the defendant's] separate statement of material facts was procedurally defective." The court rejected the plaintiff's argument, in part, because, "even if some additional headings had been required, the court's power to deny summary judgment on the basis of failure to comply with California Rules of Court, rule 3.1350 is discretionary, not mandatory. [Citations.] The facts critical to the ruling were adequately identified, and Plaintiffs have not explained how any alleged deficiency in [the] separate statement of material facts impaired Plaintiffs' ability to marshal evidence to show that material facts were in dispute . . . . We conclude the trial court did not abuse its discretion by declining to reject

16

the summary judgment motion based on the absence of headings within the separate statement of material facts." (*Ibid.*)

Here too, Nick has failed to provide any specific explanation in his briefing as to how the alleged deficiency in the District's separate statement impaired his ability to demonstrate material facts were in dispute, thereby failing, in turn, to demonstrate the trial court abused its direction.

Additionally, the cases Nick cites to support his argument are inapposite. Nick cites both *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 (*Saelzler*) and *Jimenez v. 24 Hour Fitness USA, Inc.* (2015) 237 Cal.App.4th 546, 554-555 (*Jimenez*) for the proposition that, under summary judgment standards of review, courts must "strictly construe the moving papers and evidence while liberally construing Nick's opposition and evidence." He implies that in rejecting his arguments regarding the separate statement but sustaining some of the District's objections to evidence, the trial court somehow flipped this standard.

But Nick's reasoning requires one to stretch the rule articulated in *Saelzler* and *Jimenez* too far. What the cited portion of *Saelzler* actually says is, "we must view *the evidence* in a light favorable to plaintiff as the losing party [citation], liberally construing her *evidentiary submission* while strictly scrutinizing defendants' own showing, and resolving *any evidentiary doubts or ambiguities* in plaintiff's favor." (*Saelzler*, *supra*, 25 Cal.4th at p. 768, italics added.) Likewise, *Jimenez* refers to the need to "view *the evidence* in the light most favorable to plaintiffs as the losing parties. [Citation.] *In liberally construing the evidence* in favor of the party opposing the motion, we resolve all doubts concerning *the evidence* in favor of the opponent." (*Jimenez*, *supra*, 237 Cal.App.4th at p. 554, italics added.)

The standard discussed in *Saelzler* and *Jimenez* dictates how courts ought to reach conclusions of fact on properly admitted evidence. It is not a rule that requires courts to allow the consideration of unauthenticated evidence submitted by a plaintiff while

17

harshly applying formatting requirements to a defendant. A separate statement is not, in and of itself, evidence. It is a document that summarizes evidence and creates a roadmap for the parties and court to work with in considering a motion for summary judgment. The cited portions of *Saelzler* and *Jimenez* offer nothing to persuade this court that the trial court abused its discretion in showing some degree of leniency when it allowed the District's motion to move forward using the submitted separate statement.

The trial court properly concluded the statement substantially complied with requirements and did not preclude Nick from being able to substantively consider and respond to the District's arguments.

B.      *Other Arguments Regarding Evidentiary Issues Are Waived*

Nick argues that "[t]he court . . . erred in sustaining [the District's] objections to Nick's evidence." Nick then appears to take the position that the trial court erred in sustaining objections to portions of expert declarations Nick offered in which the experts opined about the standard of care for coaches of high school football games. But Nick makes no further effort to identify the specific objections the trial court sustained or the specific statements excluded which are at issue, even though the District made objections to a combined 94 statements and exhibits in a filing in which it identified each disputed piece of evidence in one column, and listed the objections to each item in the next column. In its final ruling, contrary to Nick's representation that it sustained "every objection that [the District] made," the trial court overruled some of the objections and sustained others. In so doing, the court listed the evidentiary items at issue, as identified in the District's written objection, and gave its ruling on each item.

In short, in advancing his position that the trial court erred in sustaining objections to the evidence he submitted, Nick first fails to identify which specific objections are at issue and where the specific rulings and objections appear that are covered by the legal

18

argument he makes, and second makes no legal argument regarding many of the objections the District did make and whether the court properly ruled on those objections.

With respect to the first deficiency, California Rules of Court, "[r]ule 8.204(a)(1)(C) provides that each brief must '[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears.' [¶] 'The appellate court is not required to search the record on its own seeking error. . . . [A]ny point raised that lacks citation may, in this court's discretion, be deemed waived.' (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768.) Thus, '[i]f a party fails to support an argument with the necessary citations to the record, that portion of the brief may be stricken and the argument deemed to have been waived.' (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856; see *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [reviewing court may disregard contentions unsupported by citation to the record or legal authority].)" (*Young v. Fish & Game Com.* (2018) 24 Cal.App.5th 1178, 1190-1191.)

With respect to the second, " '[e]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration. [Citations.]' (9 Witkin, Cal. Procedure, (3d ed. 1985) Appeal, § 479, p. 469; see also *People v. Ashmus* (1991) 54 Cal.3d 932, 985, fn. 15; *Duncan v. Ramish* (1904) 142 Cal. 686, 689-690.)" (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

In light of these deficiencies, we decline to consider Nick's arguments regarding the trial court's rulings on the District's objections.

II

*Nick's Claims Are Barred Because the Browns Expressly Assumed the Risk that He Would be Injured*

The District argues, and the trial court agreed, that the release Nick and his father signed bars Nick's action against the District due to their express assumption of risk. We

19

agree.  The release is a valid express release of liability and assumption of risk that covers both Nick's injury and the actions of the District employees, and Nick cannot establish that the District or its employees acted with gross negligence.

A.      *Standard of Review*

A court must grant a motion for summary judgment when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  (Code Civ. Proc., § 437c, subd. (c).)  In moving for summary judgment, defendants have the burden to show that the cause of action has no merit because an essential element cannot be established or there is a complete defense.  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, 861.)

On appeal, we review the record and the determination of the trial court de novo, viewing the evidence in the light most favorable to plaintiffs as the losing parties.  (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003 (*Kahn*).)  "We are not bound by the trial court's reasons for granting summary judgment because we review the trial court's ruling, and not its rationale.  (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878.)"  (*Avidity Partners, LLC v. State of California* (2013) 221 Cal.App.4th 1180, 1192.)

"[C]ontract principles apply when interpreting a release, and . . . normally the meaning of contract language, including a release, is a legal question, not a factual question.  (See *Westlye v. Look Sports, Inc.* (1993) 17 Cal.App.4th 1715, 1727.)"  (*Solis v. Kirkwood Resort Co.* (2001) 94 Cal.App.4th 354, 360; see also *Cohen v. Five Brooks Stable* (2008) 159 Cal.App.4th 1476, 1483; *Benedek v. PLC Santa Monica* (2002) 104 Cal.App.4th 1351, 1356 (*Benedek*).)

20

B.     *Express Waivers of Negligence Claims in Recreational Activities Are*
*Permissible*

When an individual signs an express waiver of liability, he "promises not to exercise the right to sue for harm caused in the future by the wrongful behavior of a potential defendant, eliminating a remedy for wrongdoing." (*Coates v. Newhall Land & Farming* (1987) 191 Cal.App.3d 1, 7.)  Similarly, in signing an express assumption of risk, "the potential plaintiff agrees not to expect the potential defendant to act carefully, thus eliminating the potential defendant's duty of care, and acknowledging the possibility of negligent wrongdoing.  Both agreements permit behavior that normally would be actionable as tortious, although an express assumption of risk goes further, more clearly authorizing this behavior." (*Id.* at pp. 7-8.)

" 'In its most basic sense, assumption of risk means that the plaintiff, in advance, has given his *express* consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of injury from a known risk arising from what the defendant is to do or leave undone . . . . *The result is that the defendant is relieved of legal duty to the plaintiff; and being under no duty, he cannot be charged with negligence.*'  (Prosser & Keeton on Torts [(5th ed. 1984)] § 68, pp. 480-481, fn. omitted, second italics added.)" (*Knight v. Jewett* (1992) 3 Cal.4th 296, 338, fn. 4.)

"[C]ases have consistently held that the exculpatory provision may stand only if it does not involve 'the public interest.' " (*Tunkl v. Regents of University of Cal.* (1963) 60 Cal.2d 92, 96.)  Releases of negligence claims are not per se against the public interest.  (*Solis v. Kirkwood Resort Co., supra,* 94 Cal.App.4th at p. 360.)  Similarly, "[e]xculpatory agreements in the recreational sports context do not implicate the public interest and therefore are not void as against public policy." (*Benedek, supra,* 104 Cal.App.4th at pp. 1356-1357; see also *Lhotka v. Geographic Expeditions, Inc.* (2010) 181 Cal.App.4th 816, 823 ["[O]ur courts consistently hold that recreation does not implicate the public interest, and therefore approve exculpatory provisions required for

21

participation in recreational activities"]; *Capri v. L.A. Fitness International, LLC* (2006) 136 Cal.App.4th 1078, 1084; *Lund v. Bally's Aerobic Plus* (2000) 78 Cal.App.4th 733, 739; *Allan v. Snow Summit, Inc.* (1996) 51 Cal.App.4th 1358, 1373.)

However, "an agreement made in the context of sports or recreational programs or services, purporting to release liability for future *gross negligence*, generally is unenforceable as a matter of public policy." (*City of Santa Barbara v. Superior Court, supra,* 41 Cal.4th at p. 751, italics added.) Thus, in the recreational context, while a waiver of liability and assumption of risk can serve as a bar to liability based on negligence, it cannot serve as a bar to liability based on gross negligence.

C. *The Release the Browns Signed Covered Negligent Acts by the District and Its Employees and Nick's Injury*

1. *The Release Covered Negligent Acts by the District*

The release covered negligent acts by the district and its employees.

"California courts require a high degree of clarity and specificity in a Release in order to find that it relieves a party from liability for its own negligence. The release must 'clearly, explicitly and comprehensibly set forth to an ordinary person untrained in the law that the intent and effect of the document is to release his claims for his own personal injuries and to indemnify the defendants from and against liability to others which might occur in the future as a proximate result of the negligence of [the] defendants . . . .' (*Ferrell v. Southern Nevada Off-Road Enthusiasts, Ltd.* (1983) 147 Cal.App.3d 309, 319.)" (*Cohen v. Five Brooks Stable, supra,* 159 Cal.App.4th at pp. 1488-1489, italics omitted.) "To be effective, a release need not achieve perfection; . . . It suffices that a release be clear, unambiguous, and explicit, and that it express an agreement not to hold the released party liable for negligence. (See *Madison v. Superior Court* (1988) 203 Cal.App.3d 589, 596-600.)" (*Nat'l & Internat. Bhd. of St. Racers v. Superior Court* (1989) 215 Cal.App.3d 934, 938.)

22

Here, the release stated that if Nick were to be "hurt, injured, or even die[]," Nick and his parents would "not make a claim against or sue the El Dorado Union High School District (hereinafter EDUHSD), its trustees, officers, employees, and agents, or expect them to be responsible or pay for any damages." It acknowledged that "injuries might arise from . . . the actual or alleged failure by district employees, agents, or volunteers to adequately coach, train, instruct, or supervise," and, "undiagnosed, improperly diagnosed, untreated, improperly treated, or untimely treated actual or potential injuries . . . ." The signatories then "willingly assume[d] all risks and hazards of potential injury, paralysis, and death in the school-related activity/ies."

In addition to assuming the risks identified, in signing the release, Nick and Read, "voluntarily agree[d] to release, waive, discharge, and hold harmless the EDUHSD and its . . . employees, and agents from any and all claims of liability arising out of their negligence, or any other act or omission which causes the above-named student illness, injury, death or damages of any nature in any way connected with the student's participation in the school-related activity/ies," and "expressly agree[d] to release and discharge the EDUHSD, its trustees, officers, employees, and agents from any act or omission of negligence in rendering or failing to render any type of emergency or medical services."

In signing the release, Nick and Read unequivocally agreed to assume the risk of injuries caused by the negligent acts of the District employees in coaching and supervising Nick while he played football and in treating him for those injuries. Additionally, they agreed to release the District and any of its employees from any liability associated with their possible negligence in coaching Nick and/or treating him for injuries.

Nick argues that the release here did not cover the District and his coaches' actions or inactions because "[i]t does not reference the potential for harm by coaches. It mentions nothing about a lack of monitoring, lack of assessment by qualified medical

23

staff, or lack of emergency transport. . . . The terms are so general as to be meaningless; it applies to any school activity whether it be golf or cheerleading."

This misses the mark and mischaracterizes the facts. Though checked off from a list of activities, the form Nick and Read signed does indicate the specific activities he participated in, including football. In stating "injuries might arise from . . . the actual or alleged failure by district employees, agents, or volunteers to adequately *coach*" the release clearly contemplates potential negligent acts of district employees/volunteers retained to coach the student athletes—i.e., coaches. (Italics added.) Finally, "[w]hen a release expressly releases the defendant from any liability, it is not necessary that the plaintiff have had a specific knowledge of the particular risk that ultimately caused the injury. (*Paralift, Inc. v. Superior Court*[ (1993)] 23 Cal.App.4th [748,] 757.) If a release of *all liability is given, the release applies to any negligence of the defendant.* ' "It is only necessary that the act of negligence, which results in injury to the releasor, be reasonably related to the object or purpose for which the release is given." ' (*Ibid.*) The issue is not whether the particular risk of injury is inherent in the recreational activity to which the release applies, but rather the scope of the release. (*Madison v. Superior Court* (1988) 203 Cal.App.3d 589, 602, fn. 11; *Allan v. Snow Summit, Inc.*, *supra*, 51 Cal.App.4th at pp. 1372-1375.) [¶] An act of negligence is reasonably related to the object or purpose for which the release was given if it is included within the express scope of the release. (*Paralift, Inc. v. Superior Court*, *supra*, 23 Cal.App.4th at pp. 756-757.)" (*Benedek, supra,* 104 Cal.App.4th at pp. 1357-1358, italics added.)

The signed release covered all allegedly negligent acts by coaches, and any other employee or volunteer, while they were engaged in "coach[ing], train[ing], instruct[ing], or supervis[ing]" in football. It also applied to negligent acts by coaches, and any other employees or volunteers, involved in diagnosing and/or treating Nick for potential injuries suffered while he was engaged in playing football. If the acts or inactions of district employees at issue here were at worst negligent—if they did not rise to the level

24

of gross negligence—the Browns assumed the risk of those actions and released the District from any liability arising therefrom.

### 2. *The Release Covered Nick's Injury*

Nick suggests that he and his parents lacked the knowledge of the risk he would suffer a serious brain injury, and, therefore, the release did not exempt the District from liability associated with that injury. This argument is likewise not persuasive.

"To warrant application of the doctrine of assumption of the risk, the evidence must disclose the injured person appreciated the particular risk involved. [¶] 'He does not assume any risk he does not know or appreciate. [Citation.] Stated another way, before the doctrine is applicable, the victim must have not only general knowledge of a danger, but must have knowledge of the particular danger, that is, knowledge of the magnitude of the risk involved.' (*Vierra v. Fifth Avenue Rental Service*[ (1963)] 60 Cal.2d 266, 271.) But neither knowledge of the danger involved, nor appreciation of the magnitude of the risk, requires the clairvoyance to foresee the exact accident and injury which in fact occurred. The threat of injury need not be so great that it is probable. It is sufficient if it is known to be 'within the range of possibilities; neither sure nor necessarily apt to happen; but one that will happen if the conditions are ripe for it.' (*Tavernier v. Maes*[ (1966)] 242 Cal.App.2d 532, 544.) . . . [A]ppreciation of the magnitude of the risk does not require [one] to have had the prescience to foresee the exact emergency which in fact occurred." (*Sperling v. Hatch* (1970) 10 Cal.App.3d 54, 61.) Furthermore, "knowledge of the particular risk is unnecessary when there is an express agreement to assume all risk; by express agreement a 'plaintiff may undertake to assume all of the risks of a particular . . . situation, *whether they are known or unknown to him*.' (Rest.2d Torts, § 496D, com. a, italics added; Prosser & Keeton, Torts, *supra*, § 68, p. 482.)" (*Coates v. Newhall Land & Farming, supra,* 191 Cal.App.3d at p. 9; see also *Madison v. Superior Court, supra,* 203 Cal.App.3d at p. 601.)

25

Here, the Browns, "acknowledge[d] and willingly assume[d] *all risks and hazards of potential injury*, paralysis, *and death* in the school-related activity/ies," in which Nick participated. (Boldface italics added.) One of Nick's own experts declared that, "[w]ell before 2015 it was common knowledge that tackle football causes severe traumatic brain injuries and permanent brain damage."

Paperwork sent home as part of the handbook and signed on the same date as the release discussed the possibility that a player might suffer a concussion or other head injury and stated these injuries could have "devastating and even fatal consequences." An additional document included with the handbook and paperwork discussed how concussions are caused by "a bump, blow, or jolt to the head." The release expressly covered all injuries Nick might suffer playing football. The magnitude of all risks covered included a concussion or other traumatic brain injury.

### D. *Nick Cannot Establish the Gross Negligence*

Because the release Read and Nick signed was a valid, express waiver of District liability and contemplated the actors and injury here, Nick can only avoid summary judgment on the basis of express assumption of liability if he can establish gross negligence. We find that, under the facts before us, Nick cannot establish that gross negligence of the District or its employees contributed to his injuries.

"Gross negligence is the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences. (*People v. Watson* (1981) 30 Cal.3d 290, 296.) 'The state of mind of a person who acts with conscious indifferences to the consequences is simply, "I don't care what happens." ' (*People v. Olivas* (1985) 172 Cal.App.3d 984, 988.) The test is objective: whether a reasonable person in the defendant's position would have been aware of the risk involved. (*People v. Watson*, *supra*, 30 Cal.3d at p. 296.)" (*People v. Bennett* (1991) 54 Cal.3d 1032, 1036;

26

see also *City of Santa Barbara v. Superior Court, supra,* 41 Cal.4th at pp. 753-754; *Eastburn v. Regional Fire Protection Authority* (2003) 31 Cal.4th 1175, 1185-1186.)

" ' " '[M]ere nonfeasance, such as the failure to discover a dangerous condition or to perform a duty,' " amounts to ordinary negligence.  [Citation.]  However, to support a theory of " '[g]ross negligence,' " a plaintiff must allege facts showing "either a ' " 'want of even scant care' " ' or ' " 'an *extreme* departure from the ordinary standard of conduct.' " '  [Citations.]"  [Citations.]  " ' "[G]ross negligence" falls short of a reckless disregard of consequences, and differs from ordinary negligence only in degree, and not in kind. . . .' " '  (*Anderson v. Fitness Internat., LLC* (2016) 4 Cal.App.5th 867, 881.)" (*Willhide-Michiulis v. Mammoth Mountain Ski Area, LLC* (2018) 25 Cal.App.5th 344, 358.)  "Generally it is a triable issue of fact whether there has been such a lack of care as to constitute gross negligence (*Pacific Bell v. Colich* (1988) 198 Cal.App.3d 1225, 1240) *but not always.*  (*De Vito v. State of California*[ (1988)] [264,] 272.)"  (*Decker v. City of Imperial Beach* (1989) 209 Cal.App.3d 349, italics added.)

### 1. *Player Monitoring Was Not Grossly Negligent*

The District submitted evidence that showed they were not grossly negligent in monitoring Nick during the game.  Nick's coaches all received the concussion training required by statute and the CIF Bylaws; and during the game, both in watching players on the field and in speaking with them during halftime and time outs, they closely watched plays and monitored players for signs of a head injury that were consistent with what they were taught in concussion training but saw no such symptoms in Nick until he collapsed, including when he removed himself from the field.  The symptoms they watched for were also consistent with concussion symptoms identified in CIF materials.

Citing his own experts, Nick argues that the coaches did not do enough:  that having him play 97 plays increased his risk of injury, that the coaches ought to have removed Nick from the game at least once to assess him for a head injury given the

27

number of times he suffered blows to the head during the game, that someone ought to have taken a closer look when Nick removed himself from the game, and that it is possible a closer look in Nick's eyes would have revealed the red-flag sign of a dilated pupil.

Nick's argument ignores that stopping players and removing them every time they suffer a blow in a football game simply is not feasible.  In tackle football, tackles and falls are an inevitability and constantly stopping the game or pulling players to look every player in the eye every time they suffer a blow would interrupt the flow of the game. " '[T]he nature of a sport is highly relevant in defining the duty of care owed by the particular defendant.' (*Knight v. Jewett, supra*, 3 Cal.4th at p. 315.)  ' "[I]n the sports setting . . . conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself." [Citation.]  [Our Supreme Court has] explained that, as a matter of policy, it would not be appropriate to recognize a duty of care when to do so would require that an integral part of the sport be abandoned, or would discourage vigorous participation in sporting events.' (*Kahn v. East Side Union High School Dist., supra,* 31 Cal.4th at p. 1004.)  But the question of duty depends not only on the nature of the sport, but also on the role of the defendant whose conduct is at issue in a given case. (*Ibid.*)  ' "[A] purveyor of recreational activities owes a duty to a patron not to increase the risks inherent in the activity in which the patron has paid to engage." ' (*Id.* at p. 1005.)  Thus, in cases involving a waiver of liability for future negligence, courts have held that conduct that substantially or unreasonably increased the inherent risk of an activity or actively concealed a known risk could amount to gross negligence, which would not be barred by a release agreement.  (See *Eriksson v. Nunnink* (2011) 191 Cal.App.4th 826, 856.)" (*Willhide-Michiulis v. Mammoth Mountain Ski Area, LLC, supra,* 25 Cal.App.5th at pp. 358-359.)

Given the nature of football, and uncontroverted evidence that (1) coaches monitored players on the field for signs of a head injury (e.g., missteps and/or an

28

unsteady gait); (2) coaches took a closer look at players during discussions (e.g., to see if they are slurring their speech and/or dazed); (3) the symptoms coaches watched for were consistent with preliminary symptoms identified by the CIF and in their training; and (4) Nick displayed no warning signs during game day interactions and appeared normal as he exited the field, Nick cannot show that gross negligence by the coaches in monitoring the game and allowing him to continue playing resulted in or contributed to his injuries, or that their conduct caused an unreasonable delay in his receipt of treatment.

Moreover, on a fundamental level, for all the evidence shows, Nick may have suffered his injury during the last play before he took himself out of the game and, at that point, the evidence is he showed no signs of injury as he left the field. In fact, according to the evidence on the motion, players were known to leave the field to sit on the bench when they were merely fatigued and not injured.

At trial, the burden would be on the plaintiff to prove gross negligence. (*Eriksson v. Nunnink, supra,* 233 Cal.App.4th at pp. 733-734.) Without being able to disprove this scenario in particular, that burden, on this record, could not be met. Thus the evidence on the motion is insufficient to raise a factual dispute to be determined at trial.

### 2.      *Player Instruction Was Not Grossly Negligent*

The District also submitted evidence demonstrating they were not grossly negligent in informing students about the risks of head injuries in football. With the handbook, the District explicitly provided families with warning information about the dangers of concussions, and the signs of concussions. The coaches all said they advised students to take themselves out of the game if they were injured.

Citing his own experts, Nick claims the information provided was not enough. Specifically, he cites to the declaration of Norm Chow, who submitted a declaration regarding the importance of training students and parents on concussion causes and symptoms, and to advise them to not remain on the field and report symptoms

29

immediately if they have symptoms. In his argument, Nick cites additional experts to suggest the District ought to have had a policy or procedure in place to educate athletes regarding concussions, and that this is particularly true given students' reluctance to self-report.

Yet, at best, while these declarations might suggest the district could have done more to educate students and family, they do not demonstrate scant care, an extreme departure from norms, or conscious indifferences to the consequences. Additionally, Nick's undisputed actions in this case suggest the instruction the school provided was not wholly ineffective. Though he and his teammate both say they believed the coaching staff was referring to muscular or skeletal injuries when they were advised to take themselves out of the game and that they did not know to remove themselves for concussion symptoms, Nick did remove himself from the game, and he has not claimed that removal was due to a muscular or skeletal injury. Also, Cathey's deposition testimony suggests that Nick did know to get his coach's attention when he felt something was wrong: right before Nick collapsed, Cathey heard him call out "coach."

Nick relies on *Kahn* to support his position that the District and coaches exhibited gross negligence in the scope of their efforts to train parents and students regarding risks and symptoms associated with concussions. Nick's reliance is misplaced. In *Kahn*, a novice member of a school district's junior varsity swim team broke her neck when she executed a practice dive into a shallow racing pool while attending a competitive swim meet. (*Kahn, supra,* 31 Cal.4th at p. 995.) At issue was whether the plaintiff had produced sufficient evidence of recklessness to survive a motion for summary judgment in which the defense argued the primary assumption of risk doctrine applied. (*Id.* at pp. 996-997.) In finding there was a triable issue of fact, our Supreme Court identified far more factors than just whether or not the training coaches provided had been in keeping with recommended training methods. (*Id.* at p. 1012.) The Court reasoned, "the following factors indicated a triable issue with respect to whether the coach's behavior

30

was reckless: the lack of training in the shallow-water dive disclosed by plaintiff's evidence, especially in the face of the sequenced training recommended in the Red Cross manual submitted by plaintiff; the coach's awareness of plaintiff's deep-seated fear of such diving; his conduct in lulling her into a false sense of security through a promise that she would not be required to dive, thereby eliminating any motivation on her part to learn to dive safely; his last-minute breach of that promise under the pressure of a competitive meet; and his threat to remove her from the team or at least the meet if she refused to dive. [¶] *Clearly, a disputed issue of fact exists as to whether the coach provided any instruction at all on shallow-water diving*, and the nature of the coach's promises and threats to plaintiff also are in dispute. If a jury were to find that defendant coach directed plaintiff (a novice on the swim team) to perform a shallow racing dive in competition *without providing any instruction*, that he ignored her overwhelming fears and made a last-minute demand that she dive during competition, in breach of a previous promise that she would not be required to dive, we believe the trier of fact properly could determine that such conduct was reckless in that it was totally outside the range of the ordinary activity involved in teaching or coaching the sport of competitive swimming." (*Id.* at pp. 1012-1013, italics added.)

Thus, in *Kahn*, there was an issue as to whether the coach had provided the student *any* instruction on shallow pool dives. Here, Nick and his family acknowledged their receipt of the handbook and their signature on the forms. Thus, though perhaps it was not as thorough as the information Nick's experts would personally provide, the District did provide players and their families written information on concussion symptoms and protocols.

Also, in *Kahn*, the alleged lack of instruction was coupled with a last-minute demand that the student perform a task she had expressed great fear of, in the face of prior representations she would not be required to perform that task. Here Nick knew he could—and did—remove himself from the game. Contrary to Nick's argument, *Kahn* is

not "on all fours" with this case. Nick's reliance on *Kahn* does not persuade us that he has raised a triable issue as to whether the District was grossly negligent in light of information provided regarding concussions.

### 3. *The District Was Not Grossly Negligent in Providing Medical Care*

The District submitted evidence that they were not grossly negligent in providing medical care at the game. The various CIF Bylaws and guidelines "recommended" that school administrative staff "[p]rovide first-aid capability and/or medical doctor availability as needed" at school athletic competitions; stated that "[t]he home team shall endeavor to have a doctor at the game"; or suggested that, "[i]f *possible*, a physician and/or EMT should be present for all games/practices." (Italics added.)

Here, Aliff did make an effort to secure the presence of a medical doctor but the doctor declined Aliff's request. Additionally, a chiropractor with some professional training in evaluating for traumatic brain injuries and concussions and an EMT with a truck equipped with basic first aid and life support equipment attended the game.

Once Nick collapsed, Aveni, the chiropractor examined him. Though at first he suspected Nick was suffering a heat related ailment, upon further examination Aveni noticed there "was some cognitive dysfunction," and concluded, "there was something neurologic happening." Aveni then told the EMT they needed a unit for transport. The EMT said it was only "minutes" between Nick's collapse and the time he radioed for an ambulance, and Read estimated it took 10 minutes from the time Nick collapsed for an ambulance to arrive.

Nick argues that because the District failed to secure "qualified" medical staff or an ambulance present at the game, there is a triable issue as to whether the District acted with gross negligence, resulting in a delay in treatment and the exacerbation of Nick's injuries. To support his argument, Nick cites *Hass v. RhodyCo Productions* (2018)

26 Cal.App.5th 11 (*Hass*) and *Arista v. County of Riverside* (2018) 29 Cal.App.5th 1051 (*Arista*). Both cases are distinguishable.

Nick states, "[l]ike Nick, the *Hass* plaintiffs presented expert evidence that the standard of care required a competent medical doctor and the use of chiropractors was insufficient." But the court's reason in *Hass* was far more nuanced than this suggests. In *Hass*, the court concluded, "that, viewing the evidence in the light most favorable to them, it is possible that the Hass Family could establish that, despite the potential for grave risk of harm in the sport of long-distance running, RhodyCo failed to implement the EMS Plan in several material ways and that its management of the Half Marathon—in particular with respect to the allocation of medical resources to the finish line and communication among race personnel—constituted an extreme departure from the standard of care for events of its type. This is sufficient to raise a triable issue of fact with respect to gross negligence." (*Hass*, *supra*, 26 Cal.App.5th at pp. 33-34.)

In *Hass*, the decedent had participated in a half marathon with over 10,000 participants. (*Hass*, *supra*, 26 Cal.App.5th at p.18.) He collapsed and died at the race's finish line. (*Id.* at p. 17.) Though the event organizer's emergency service plan included having representatives from a chiropractic college at key areas along the race route, it also "indicated that one M.D., six or more EMTs, and one automatic external defibrillator (AED) would be located at the finish line." (*Id.* at p. 19.) The plaintiffs argued and presented evidence to show that, contrary to the race organizer's plans, "the only medical personnel assigned to the finish line were Dr. Rosenberg (a chiropractor) and the event coordinator (a chiropractic student), neither of whom were actually at the finish line when Hass collapsed. They further claimed that the AED was in the medical tent located approximately 200 yards away, in the postrace expo area; that no event medical personnel arrived at the scene until 10 minutes after Hass collapsed; and that, when a bystander arrived with the AED at the 11-minute mark, it was too late to help Hass." (*Id.* at p. 20.)

In *Hass*, the court's decision did not rest on the qualifications of chiropractors in general. Instead, the court focused on the fact that the race organizer's actions had drastically deviated from its own plan, the complete lack of anyone from the medical team at the finish line, and the particular need to have medical doctors available to treat medical emergencies at a crowded finish line.

Here, the District complied with the CIF recommendations for medical staff at games, Aveni examined Nick immediately after he collapsed, and Nick was in an ambulance called by the on-site EMT soon after collapse.

Much like the facts in *Hass*, the facts in *Arista* are markedly distinguishable. In *Arista*, the court found that plaintiffs had alleged facts sufficient to support a finding of scant care when they alleged—after local authorities opted not to look for a missing man overnight: "(1) a ping of the victim's cell phone revealed the phone was in the" area where his body was found; (2) one employee told another " 'he was "not sure what we're doing here," that [the victim] was "probably just running around on his wife" and was "just covering his tracks," suggesting that [the victim] was not missing, but instead involved in some adulterous affair' "; and (3) a representative told the wife, " ' "[I]f it was a child, [he] would send a helicopter out there right now." ' " (*Arista*, *supra*, 29 Cal.App.5th at p. 1063.) The court reasoned, "[t]he facts pled by the Family, when accepted as true, support a finding of a want of even scant care. The allegation that [the incident commander] would have sent a helicopter for a child reflects there were resources that could have been deployed [that] night . . . to further the search efforts that had been undertaken. The allegation that [the incident commander] believed the victim was having an affair reflects that, despite having resources to continue searching for the victim, [the incident commander] chose to suspend the search overnight because he believed the victim was not missing. The allegation that the victim's cell phone was in the area . . . reflects there was reason to believe the victim was missing, but [the incident commander] *carelessly disregarded that evidence and chose to postpone search efforts*

34

*until the morning*." (*Id.* at pp. 1063-1064.) The facts here demonstrate far more care for Nick's welfare than the alleged facts in *Arista* demonstrated for the victim's welfare.

DISPOSITION

The judgment is affirmed.

                                  _____

                                  HULL, J.

We concur:

_____

RAYE, P. J.

_____

EARL, J.