Filed 2/2/23  Himnel USA v. City of Rancho Cucamonga CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| HIMNEL USA, INC. et al., | |
| Plaintiffs and Appellants, | E076801 |
| v. | (Super. Ct. No. CIVDS2014554) |
| CITY OF RANCHO CUCAMONGA, | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of San Bernardino County.  David Cohn, Judge.  Affirmed in part, reversed in part.

Larson LLP, Stephen G. Larson, R.C. Harlan, John S Lee and Jennifer C. Cooper, for Plaintiffs and Appellants.

Richards, Watson & Gershon, Robert C. Ceccon, Saskia T. Asamura and Darrelle M. Field, for Defendant and Respondent.

1

I.

INTRODUCTION

Appellant Himnel USA, Inc. dba St. Mary's Montessori School (St. Mary's) runs a Montessori school on property owned by appellant Global Property Holdings LLC (GPH) in respondent the City of Rancho Cucamonga (the City). Appellants sought to expand the school's facilities in order to operate a private religious elementary school. Appellants claim that because their intended school is religious, the City discriminated against them by delaying the school's construction and imposing fees that are not levied on other similarly situated construction projects.

The trial court granted the City's special motion to strike two of appellants' causes of action under Code of Civil Procedure section 425.16[1], commonly referred to as the "anti-SLAPP"[2] statute. We affirm in part and reverse in part.

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

[2] A "SLAPP" is a strategic lawsuit against public participation.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

St. Mary's has run a Montessori daycare center in the City since 2013. The center is about 6,700 square feet and can accommodate about 150 students and staff.

In mid-2017, St. Mary's and GPH began the entitlement process to construct a new 13,000 square foot single-story building on the property (the project). The proposed new building would be used for a day care center, a private religious elementary school, and a teacher training center. Instead of approving the project, however, the City "subjected [appellants] to a concerted campaign of targeted harassment, deliberate misapplication of regulatory burdens, and attempts to destroy the [p]roject."

After discussions with City personnel, St. Mary's and GPH proposed a smaller, 10,000 square foot addition to the existing day care center. The City's Design Review and Committee and Technical Review Committee approved of the proposal as submitted. Both Committees recommended to the then-Planning Director, defendant Candyce Burnett, that the project proposal be approved as submitted.

---

[3] The factual summary is drawn from appellants' operative Amended Verified Complaint (the Complaint). (See Code Civ. Proc. § 425.16, subd. (b)(2); *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067 (*Park*).) We accept as true all properly pled facts. (*Young v. Tri-City Healthcare Dist.* (2012) 210 Cal.App.4th 35, 54.)

Under the City's municipal code, Burnett had an obligation to approve the project, which would have allowed appellants to begin construction in July 2017. Burnett, however, "subsequently took discriminatory measures—and directed City staff to take similarly unlawful actions—calculated to delay and undermine the [p]roject."

In August 2018, Burnett called Windrows Elementary, a local public elementary school, to elicit objections to appellants' project. Burnett suggested that Windrows should object to the project because the school could lose funding if its students instead enrolled at appellants' proposed school. Burnett also referred the project to the City's Police Department, justifying the referral by falsely stating that the project is in a high-crime area.

A day later, Burnett directed Assistant City Planner Dat Tran to "conspicuously photograph" appellants' property "while young children were attending day care." At Burnett's direction, Tran also conducted "a walkthrough" of appellants' property with a City police officer. According to appellants, Burnett directed these actions "to spark privacy and safety concerns from parents" to raise opposition to the project.

Burnett recused herself from the project about a week later because her children attend Windrows. Two weeks later, however, Burnett "sent an inflammatory letter to City residents," including Windrows, "seeking to raise opposition" to appellants' project. And instead of approving the project, Burnett referred it to the City's Planning Commission in September 2018.

4

The project was eventually reassigned to defendant Felecia Marshall, an engineer for the City. At Burnett's direction, Marshall continued to "unreasonably delay[] approval" of the project. Marshall imposed "a series of ever-changing demands, some of which contradicted the City's own policies," and withheld granting appellants a permit until they paid "substantial fees," which were illegal under and local laws.

In particular, in May 2019, the City imposed a nearly $900,000 Transportation Development Fee (TDF) as a "development fee," and a "police fee" of about $5,600. The TDF was imposed as a result of the City's deliberate and misapplication of Resolution 18-114 (the Resolution) which imposes a $2,714 fee per day care student. The City charged appellants the TDF based on a calculation of 326.74 daycare students, even though St. Mary's had an enrollment cap of 150 day care students.

According to appellants, "*no* development fee was owed." To date, the City has never imposed a TDF on another private elementary other than St. Mary's.

After appellants voiced their disagreement with the TDF and the City's misreading of the Resolution, the City "concede[d] error and reduced the fee," but still imposed a TDF of about $445,000. The City refused to allow appellants to proceed with the project until they paid the TDF in full. Despite objecting and unsuccessfully pursuing an administrative remedy with the City, appellants paid the TDF by taking out a loan with a 14 percent to percent interest rate.

Appellants tried to resolve the dispute through discussions with City Manager John Gillison and Assistant City Manager Matthew Burris. Gillison and Burris told appellants that the City intended to refund the $445,000 TDF that appellants had paid. The City, however, never did so.

Appellants allege that the City's "illegal and discriminatory conduct resulted in significant injury to [them], including increased construction costs and lost profits." Because the City delayed approving the project, appellants had to retain a different construction company at an increased cost of nearly $850,000. Appellants also lost about $260,000 in profits because they could not open the new facility for the 2019-2020 school year.

Appellants sued the City, Burnett, Marshall, Gillison, and Burris for various causes of action, only two of which are relevant to this appeal. Appellants' third cause of action, brought against only the City, is a *Monell*[4] claim under 42 U.S.C. section 1983. Their fifth cause of action for intentional and negligent interference with prospective economic advantage is brought against all defendants.

---

[4] See *Monell v. Department of Social Services* (1978) 436 U.S. 658 (*Monell*). "*Monell* provides that a governmental entity may only be held liable where the entity causes a constitutional violation." (*Arista v. County of Riverside* (2018) 29 Cal.App.5th 1051, 1064.)

The City moved to strike both claims under the anti-SLAPP statute.[5] The trial court granted the motion and struck both claims in full. Appellants timely appealed.

## III.

## DISCUSSION

Appellants principally contend the trial court erroneously granted the City's anti-SLAPP motion because (1) their third and fifth causes of action do not arise from protected activity and (2) even if they did, they have the requisite "minimal merit."[6] (See *Park*, *supra*, 2 Cal.5th at p. 1064.)

---

[5] The City also demurred to the claims, but the trial court found the demurrers moot given its ruling on the anti-SLAPP motion. The City's demurrers to appellants' other claims are not at issue in this appeal.

[6] The City argues appellants have waived or forfeited a number of their arguments. As explained in more detail below, we agree in part. We agree with the City that appellants forfeited any argument that defendants violated their rights under the Free Exercise Clause of the First Amendment. Appellants never suggested in the Complaint or in the trial court that their *Monell* cause of action was based on an alleged Free Exercise Clause violation. Instead, appellants' *Monell* claim alleges the City violated their equal protection rights only. To the extent appellants now raise a Free Exercise challenge, they forfeited the issue by raising it for the first time on appeal. (See *Perez v. Grajales* (2008) 169 Cal.App.4th 580, 591-592 [arguments raised for the first time on appeal are forfeited].) We disagree, however, that appellants forfeited their appellate arguments by failing to accurately cite the record. Although a handful of their record citations may be inaccurate, appellants have otherwise adequately cited the record. We address the City's contention that appellants forfeited all evidentiary objections below, but need not address the City's argument that appellants waived their arguments raised only in footnotes. Finally, we decline to find appellants forfeited their appellate arguments because their brief is 427 words over the limit.

7

A.  *Applicable Law and Standard of Review*

The anti-SLAPP statute applies to any cause of action against a defendant "arising from any act of that person in furtherance of the person's right of petition or free speech." (§ 425.16, subd. (b)(1).)  The anti-SLAPP statute protects against the use of the judicial system to chill the constitutionally-protected right to make statements or writings before judicial or other official proceedings, and in connection with an issue under consideration or review by a judicial body or other legally authorized official proceeding.  (§ 425.16, subd. (e).)  The statute defines four categories of protected conduct, only two of which are relevant here:  (1) "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" (§ 425.16, subd. (e)(1)) and (2) "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (§ 425.16, subd. (e)(4).)

We analyze anti-SLAPP motions in two steps.  (*Park*, *supra*, 2 Cal.5th at p. 1060.) At the first step, we ask whether the defendant has shown that "the challenged allegations or claims" arise from the defendant's "protected activity."  (*Ibid*.)  If and only if the defendant meets its burden at the first step, we move to the second step, which asks whether the plaintiff has demonstrated that its challenged "claims have at least 'minimal merit.'"  (*Id*. at p. 1061.)

8

We apply the de novo standard of review to determine if the trial court properly granted an anti-SLAPP motion. (*Park*, *supra*, 2 Cal.5th at p. 1067.) In doing so, "[w]e exercise independent judgment in determining whether, based on our own review of the record, the challenged claims arise from protected activity." (*Ibid.*)

The same standards apply to a "mixed" cause of action, "that is, a cause of action that rests on allegations of multiple acts, some of which constitute protected activity and some of which do not." (*Bonni*, *supra*, 11 Cal.5th at p. 1010.) At the first step, "the moving defendant must identify the acts alleged in the complaint that it asserts are protected and what claims for relief are predicated on them," and then we "examine whether those acts are protected and supply the basis for any claims. (*Ibid.*)

B. *Whether Appellants Claims Arise Out of Defendants' Protected Activity*

1. *Protected Activity*

"A claim arises from protected activity when that activity underlies or forms the basis for the claim." (*Park*, *supra*, 2 Cal.5th at p. 1062.) To decide if a claim arises from protected activity, we "must consider the claim's elements, the actions alleged to establish those elements, and whether those actions are protected." (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1015 (*Bonni*).)

To arise from protected activity, "'the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech.'" (*Park*, *supra*, 2 Cal.5th at p. 1063.) In determining whether a cause of action arises from protected activity "'the critical consideration is whether the cause of action is

9

*based on* the defendant's protected free speech or petitioning activity. [Citations.]'" (*Department of Fair Employment & Housing v. 1105 Alta Loma Road Apartments, LLC* (2007) 154 Cal.App.4th 1273, 1284.)

In short, a claim arises from protected activity only if "that activity underlies or forms the basis for the claim." (*Park*, *supra*, 2 Cal.5th at p. 1062.) Thus, to satisfy its burden at step one of the anti-SLAPP analysis, the defendant must show that its "'*conduct by which plaintiff claims to have been injured* falls within one of the four categories'" of protected conduct described in section 425.16, subdivision (e). (*Ibid.*) This means that "[a]llegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 394.) We therefore must distinguish "between activities that form the basis for a claim and those that merely lead to the liability-creating activity or provide evidentiary support for the claim." (*Park*, *supra*, at p. 1064.)

*2. Analysis*

Appellants contend that their *Monell* and interference claims arise out of the same allegations in the Complaint, so the analysis is for whether the claims arise from protected activity is the same. But, like the City, we have had trouble discerning which allegations underlie the claims, because appellants' arguments have shifted during the litigation. As discussed below, it is not entirely clear from their opening brief which arguments they advance on appeal.

In the Complaint's general allegations, appellants allege that the City "targeted" them for discrimination "by unreasonably delaying approval" of the Project and withholding a building permit for it. They also allege that the City imposed the nearly $900,000 TDF on the project (later reduced to about $445,000), even though the City has never imposed a TDF on an elementary school, and refused to approve appellants' project until they paid the TDF in full. Because the City "improperly blocked" construction of the project, appellants claimed they were forced to retain a different construction company, at an increased cost of about $850,000.

Appellants' *Monell* claim, which incorporates by reference the Complaint's general allegations, alleges that the City intentionally discriminated against appellants for their religious beliefs in violation of their equal protection rights under the federal Constitution. Appellants allege the City "intentionally treated [them] and their [p]roject . . . differently from others similarly situation" for no reason other than to discriminate against them because of their religion. They alleged that this discriminatory treatment stemmed from the City's "policies, practices, and/or customs," which were deliberately indifferent to appellants' equal protection rights, and permitted, condoned, and/or ratified the individual defendants' "involvement and oversight of development projects in the City." Appellants' *Monell* claim thus alleged that the City's policies, practices, and/or customs were the "moving force" behind the individual defendants' "intentional differential treatment of [appellants] and their project from others similarly situated."

11

In its anti-SLAPP motion, the City argued appellants' *Monell* claim rests on five allegations: (1) Burnett "called the local public elementary school to allegedly 'elicit objections to the [p]roject' (Compl. ¶ 27); (2) Ms. Burnett referred the [p]roject to the Police Department as part of the City's review of the [p]roject (Compl. ¶ 28); (3) Mr. Tran conducted an investigation at the [p]roject site as part of the City's review of the [p]roject [at Burnett's direction] (Compl. ¶ 29); (4) Ms. Burnett wrote an allegedly 'inflammatory' letter to City residents regarding the [p]roject (Compl. ¶ 32); and (5) Ms. Burnett referred the [p]roject to the Planning Commission for further review and approval (Compl. ¶ 33)." The City argued that all five of these actions constitute protected activity under section 425.16, subdivision (e)(2) and (4).

In their opposition to the City's anti-SLAPP motion, appellants' introduction states that their lawsuit is "based on the City's decision" to impose the TDF. They thus argued that the "crux" of their *Monell* and interference claims is the City's "wrongful imposition" of the TDF "through [the] Resolution." Appellants asserted that their claims were not based on any City employee's speech or petitioning activity, but rather were "based on the City's erroneous interpretation and validity of [the] Resolution . . . and its repeated discriminatory decisions to impose the [TDF]." Appellants thus argued Burnett's challenged actions were "merely incidental" to their claims, and repeated that the claims "arise from the City's selective enforcement of [the] Resolution," not "Burnett or any City employee's protected activity." In concluding their argument on the issue, appellants again emphasized that their *Monell* and interference claims "clearly arise out

12

of the City's imposition of the [TDF] under [the] Resolution, and not out of the incidental allegations regarding . . . Burnett's personal animus towards [appellants]."

At the hearing on the City's motion, however, appellants did not argue that the TDF was the basis for their *Monell* or interference claim. Appellants argued that the *Monell* claim was based the City's unspecified "policies and regulations." They claimed that Burnett's five challenged actions were only evidence of the policies that their *Monell* claim is based on. Appellants then argued that the City's challenged policy was "an unwritten policy" to treat religious schools differently than non-religious schools, which "implicated a number of other unwritten policies that were alleged in the complaint perhaps unartfully." Appellants provided no argument on whether their interference claim arose from protected activity. As the trial court observed in its ruling after the hearing, appellants appeared to have abandoned their argument that their *Monell* claim arises from the imposition of the TDF at the hearing.

In the section of their opening brief about whether their *Monell* and interference claims arise from protected activity, appellants do not dispute that the claims are based, at least in part, on Burnett's five challenged actions identified in the City's anti-SLAPP motion. But they argue that all of these actions by Burnett constitute "adverse decisions" only, not protected activity. As appellants put it, their *Monell* and interference claims are "based on adverse decisions made by Burnett," which "include, among others, [her] *decision* to call Windrows elementary, her *decision* to refer the [p]roject to the City's Police Department, her *decision* to send Dat Tran to the Property to take pictures, her

13

*decision* to send a second letter to City residents and her *decision* to refer the [p]roject to the Planning Commission." Appellants contend that Burnett made these decisions to further the City's policy of treating religious schools differently than non-religious schools.

In the section of their opening brief on whether their *Monell* and interference claims arise from protected activity, appellants preface their discussion by arguing that the claims "are premised on *decisions* made by Burnett" and the other individual defendants. But appellants do not identify any other *specific* decisions by Burnett or the other individual defendants that purportedly form the basis for the claims beyond Burnett's five alleged acts that are the subject of the City's anti-SLAPP motion. Notably, appellants do not mention the TDF or Marshall's specific alleged actions. Instead, the only specific allegations appellants address and argue do not amount to protected activity are Burnett's five challenged acts (or "adverse decisions") outlined above.

Later in their opening brief, however, appellants argue that their *Monell* claim does not arise from Burnett's five challenged "decisions," but instead arises from the City's discriminatory policy to treat religiously affiliated schools differently than non-religiously affiliated ones. Thus, according to appellants, Burnett's conduct is only *evidence* supporting their *Monell* claim. Appellants clarified that this is their position in their reply brief and at oral argument.

14

To determine whether a plaintiff's claim arises from protected activity for purposes of an anti-SLAPP motion's first prong, we "consider the elements of the challenged claim and what actions by defendant supply those elements and consequently form the basis for liability." (*Park*, *supra*, 2 Cal.5th at p. 1063.) Our Supreme Court has cautioned that these actions "that form the basis for a claim" differ from "those that merely lead to the liability-creating activity or provide evidentiary support for the claim." (*Id*. at p. 1064.)

Appellants' *Monell* claim is founded on the federal law known as Section 1983 (42 U.S.C. § 1983), which typically provides a cause of action against individual persons: state and local officials who violate constitutional and statutory rights while acting "under color of" state law. In *Monell*, *supra*, 436 U.S. at p. 691, the United States Supreme Court allowed a Section 1983 claim against a local government entity like a city (rather than a person), but only in a limited way. The Supreme Court held that cities are *not* liable for the acts of their employees under Section 1983 under the theory of respondeat superior that makes private employers liable for employee actions. Rather, a city can be liable only "when execution of a government policy or custom . . . inflicts the injury." (*Id*. at p. 694; *Pitts v. County of Kern* (1998) 17 Cal.4th 340, 349.)

Thus, a *Monell* claim arises from either "an express government policy" or "a custom or practice so widespread in usage as to constitute the functional equivalent of an express policy." (*Choate v. County of Orange* (2000) 86 Cal.App.4th 312, 328; *City of Canton, Ohio v. Harris* (1989) 489 U.S. 378, 389 ["a municipality can be liable under §

15

1983 only where its policies are the 'moving force [behind] the constitutional violation.'"].)  For that reason, the elements of a *Monell* claim require demonstrating a policy as evidenced by either a express policy (oral or written) or a widespread custom or practice which is functional equivalent of an express policy.

In sum, to state a *Monell* claim, "[t]he plaintiff must establish that[:] (1) the plaintiff was deprived of a constitutional right; (2) the government entity had a policy; (3) this policy amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy was the moving force behind the constitutional violation."  (*Perry v. County of Fresno* (2013) 215 Cal.App.4th 94, 105-106.)  As our division has explained, to establish *Monell* liability, a plaintiff must identify a policy (or practice), attribute it to the city, and show a link between the policy and a constitutional violation that injured the plaintiff.  (*Arista v. County of Riverside* (2018) 29 Cal.App.5th 1051, 1064.)  These are the essential elements that appellants had to allege in their complaint.

In their Complaint, Appellants alleged "policies, practices, or customs" that violated their equal protection rights by treating them differently, where they are a religious group.  They fail to more specifically identify the specific policy, practice or custom.  This arguably provides the basis for a demurrer aimed at requiring the complaint to be pled with more certainty.  (See Code Civ. Proc. § 430.10, subd. (f).)

But even if the policy or custom alleged is vague, it does not follow that appellants' *Monell* claim arises from something other than a policy or custom for purposes of the anti-SLAPP statute.  The City in its anti-SLAPP motion picked several

16

facts from the complaint's general allegations and asserted that they are protected acts that form the basis for claim. These acts, however, do not supply the *elements* of the claim, as it is a policy that does so and "consequently form[s] the basis for liability" for anti-SLAPP purposes. (*Park v. Board of Trustees*, *supra*, 2 Cal.5th at p. 1063.) If the claim is valid, the acts alleged might "provide evidentiary support" at trial for the existence of the policy or its effect—as appellants assert. (*Id*. at p. 1064.)

As appellants argued to the trial court, the "critical point" is that "the *Monell* claim is necessarily based and arises out of a municipality's policies and regulations." They argued that the City had the "unwritten policy . . . to treat religiously affiliated schools differently than non-religiously affiliated schools." They stated in their opposition to the City's anti-SLAPP motion that their *Monell* claim "arise[s] from City's selective enforcement of the Resolution, and not from [] Burnett or any City employee's protected activity." At the hearing on the motion, they emphasized that the acts alleged in the Complaint are "simply actions taken by City employees that serve as evidence of the policies that the *Monell* claim is based on."

The "anti-SLAPP statute is designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern." (*Wilson v. Cable News Network* (2019) 7 Cal.5th 871, 883-884.) Appellants allege that the City had a policy or custom that caused an unconstitutional violation, which is what is necessary to plead the elements of their *Monell* claim. (*Arista v. County of Riverside*, *supra*, 29 Cal.App.5th at p. 1064.) The elements of the claim, as alleged in

17

the Complaint, show that it is directed at a City policy or custom, not at speaking or petitioning on a matter of public concern.

An act-by-act analysis of whether the facts pled in the Complaint involve speech could lead to striking pieces of evidence that would be offered to prove the existence of the policy or its effect, and which appellants chose to allege in the Complaint, even though beyond what was necessary to articulate the elements. That is not the function of the anti-SLAPP statute, and the motion should have been denied as to the *Monell* claim. Whether the claim is stated with enough specificity, or whether it has merit, are issues separate from determining whether the claim arises from protected activity for anti-SLAPP purposes. Because appellants' *Monell* claim does not arise from protected activity, the trial court erroneously granted the City's anti-SLAPP motion striking the claim.

3. *Interference Claim*

Appellants' interference claim is based on Burnett's "adverse decisions," including, among other unspecified decisions, her "[1] *decision* to call Windrows elementary, [2] her *decision* to refer the Project to the City's Police Department, [3] her *decision* to send Dat Tran to the Property to take pictures, [4] her *decision* to send a second letter to City residents and [5] her *decision* to refer the Project to the Planning Commission."

18

As to these five challenged acts, we agree with the City that the first and fourth alleged acts (calling the local public elementary school and writing an "inflammatory" letter) are protected activity, but disagree as to her second, third, and fifth alleged acts (referring the Project to the police department, directing Tran to investigate the project, and referring the Project to the Planning Commission).

Three recent cases appellants rely on guide our analysis here. In *Park*, the plaintiff, a California State University (CSU) professor, alleged CSU denied him tenure based on his national origin. (*Park*, *supra*, 2 Cal.5th at p. 1061.) CSU filed an anti-SLAPP motion, arguing that the plaintiff's complaint arose from protected activity— CSU's decision to deny him tenure and communications made during the deliberations leading up to that decision. (*Ibid*.) The court explained that a claim may be stricken under the anti-SLAPP statute "only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Id*. at p. 1060.) Our Supreme Court held the plaintiff's complaint did not arise from protected activity because it did not turn on any proceedings or statements, "but only on the denial of tenure itself and whether the motive for that action was impermissible." (*Id*. at p. 1068.) The court explained that "[t]he tenure decision may have been communicated orally or in writing, but that communication does not convert [the plaintiff's] suit to one arising from such speech." (*Ibid*.) And although the school's dean's "alleged comments may supply evidence of animus . . . that does not convert the statements themselves into the basis for liability." (*Ibid*.) Instead, the

19

plaintiff's claim was based only on CSU's allegedly discriminatory decision to deny him tenure based on his national origin, and thus he "'could have omitted allegations regarding communicative acts . . . and still state the same claims.' [Citation.]" (*Ibid.*)

In *Bonni* (which was decided while this appeal was pending), our Supreme Court considered whether a physician's retaliation claim stemming from his hospital's peer review process arose from protected activity. (*Bonni*, *supra*, 11 Cal.5th at p. 1004.) "Under California law, hospitals must use a process of professional peer review to evaluate physicians' qualifications for medical staff privileges. [Citation.] Because the loss of privileges can significantly limit a physician's ability to practice medicine, peer review proceedings are a frequent subject of litigation in California courts." (*Id.* at p. 1004.) The plaintiff alleged defendants retaliated against him for raising concerns about patient care, which culminated in his staff privileges being terminated after his peer review. (*Ibid.*) Our Supreme Court held that some, but not all of the defendants' alleged retaliatory actions were subject to an anti-SLAPP motion. (*Id.* at p. 1016.)

The *Bonni* court held that several acts the plaintiff alleged were retaliatory were protected activity because they concerned "statements made in connection with an official proceeding." (*Bonni*, *supra*, 11 Cal.5th at p. 1019.) But the *Bonni* court held that two of the plaintiff's core allegations of retaliation—the suspension and termination of his hospital privileges—were not protected activity. (*Ibid.*) The court reasoned that "disciplining a doctor based on the view that the doctor's skills are deficient is not the same thing as making a public statement to that effect" because "[t]he latter is, or may be,

20

speech on a matter of public concern," but "[t]he former is not speech at all." (*Id*. at p. 1021.) Thus, the allegedly retaliatory "disciplinary actions central to" the *Bonni*'s retaliation claim were not protected. (*Id*. at p. 1026.)

Applying *Park*, the court in *Laker v. Board of Trustees of California State University* (2019) 32 Cal.App.5th 745 (*Laker*), similarly found that the employer's statements were protected activity, but its retaliatory actions were not. The plaintiff alleged that his employer, California State University, retaliated against him by subjecting him to "three meritless investigations" and to "red flag[ging]" him as someone who should not be allowed to meet the university's president. (*Id*. at p. 773.) The Court of Appeal held that these actions were not subject to an anti-SLAPP motion, reasoning that although the plaintiff "will no doubt need to use speech by University employees as evidence to support his claims, the speech is not—by itself—the basis of the claim.

As *Park*, *Bonni*, and *Laker* show, discriminatory and retaliatory, non-communicative *decisions* are not protected activities even though speech associated with those actions generally is protected activity. (See *Laker*, *supra*, 32 Cal.App.5th at p. 776 ["*Park* suggests the potential importance of distinguishing between decisions made by entities from the speech of those involved in the decision"].) This is true even if the challenged decisions are made by a government agency or employer. (See *Park*, *supra*, 2 Cal.5th at p. 1067 ["Failing to distinguish between the challenged decisions and the speech that leads to them or thereafter expresses them 'would chill the resort to legitimate judicial oversight over potential abuses of legislative and administrative power.'"]; see

21

also *San Ramon Valley Fire Protection Dist. v. Contra Costa County Employees'*
*Retirement Assn.* (2004) 125 Cal.App.4th 343, 354 ["Acts of governance mandated by
law, without more, are not exercises of free speech or petition."].)

Here, two of Burnett's challenged actions—calling Windrows to solicit objections
to appellants' project and writing an "inflammatory" letter (factors 1 & 4)—are protected
speech. By calling Windrows to drum up opposition to appellants' school by telling
Windrows that it could lose public funding if appellants' school were constructed,
Burnett was engaging in "conduct in furtherance of the exercise of . . . the constitutional
right to free speech in connection with a public issue or an issue of public interest."
(§ 425.16, subd. (e)(4).) (See *Tuchscher Development Enterprises, Inc. v. San Diego*
*Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1233 [development of private bayfront
property was an issue of public interest]; *Ludwig v. Superior Court* (1995) 37
Cal.App.4th 8, 15 [development of a mall "with potential environmental effects such as
increased traffic and impact[s] on natural drainage, was clearly a matter of public
interest"].) Burnett continued to engage in protected speech under section 425.16,
subdivision (e)(4) when she sent a letter to City residents, including Windrows, "seeking
to raise opposition" to appellants' project. (See *Tuchscher Development Enterprises, Inc.*
*v. San Diego Unified Port Dist.*, *supra*, at p. 1233; *Ludwig v. Superior Court*, *supra*, at p.
15.) Appellants thus allege Burnett's phone call and letter "to be the 'injury-producing
conduct.'" (*Laker*, *supra*, 32 Cal.App.5th at p. 778.) As a result, appellants' interference

22

claim arises from Burnett's protected activity under section 425.16, subdivision (e)(4) insofar it is based on her phone call and letter.  (See *Laker*, *supra*, at pp. 777-778.)

However, Burnett's three remaining acts at issue are not protected activity. Burnett's referrals of appellants' project to the police department and to the Planning Commission do not constitute a "written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law."  (§ 425.16, subd. (e)(2).)  Nor do the referrals qualify as "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (§ 425.16, subd. (e)(4); see *San Ramon Valley Fire Protection District v. Contra Costa County Employees' Retirement Assn.*, *supra*, 125 Cal.App.4th at pp. 348-349 [public board's vote regarding public employees' compensation did not arise from protected activity]; *Young v. Tri-City Healthcare District*, *supra*, 210 Cal.App.4th at p. 59 [administrative body's denial of hearing did not arise from protected activity].) Burnett's directing Tran to investigate appellants' property likewise is not protected activity under section 425.16, subdivision (e)(2) or (4).

Rather, Burnett's referrals and directions to Tran were *decisions* Burnett made for the City in her official capacity as the City's Planning Director.  Those decisions "may have been communicated orally or in writing, but that communication does not convert" appellants' interference claim into "one arising from such speech."  (*Park*, *supra*, 2 Cal.5th at p. 1068.)  Appellants "will no doubt need to use speech by [City] employees as

23

evidence to support" their interference claim insofar as it is based on Burnett's referrals and directions to Tran in her role as Planning Director. (*Laker*, *supra*, 32 Cal.App.5th at p. 773.) But "the speech is not—by itself—the basis of the claim." (*Ibid*.) Appellants challenge only Burnett's referral decisions and her decision to direct Tran to investigate the project, not the speech she used to communicate those decisions. We therefore conclude appellants' interference claim does not arise from protected activity to the extent it rests on those decisions. (See *Park*, *supra*, 2 Cal.5th at p. 1071 [courts may not "ignor[e] the distinction between a government entity's decisions and the individual speech or petitioning that may contribute to them," footnote omitted].)

We therefore reverse the trial court's order granting the City's anti-SLAPP motion striking appellants' interference claim to the extent it is based on Burnett referring appellants' project to the police department and to the Planning Commission (factors 2 & 5) and Burnett directing Tran to investigate the project (factor 3). (See *Bonni*, *supra*, 11 Cal.5th at pp. 1004, 1026-1027 [reversing in part and affirming in part because only some of plaintiff's retaliation claims arose from protected activity, and remanding for appellate court to consider whether plaintiff satisfied second step of anti-SLAPP analysis "for those discrete claims arising from protected activity"].)

C. *Whether Appellants' Interference Claim Has Minimal Merit*

Because the City met its burden of showing that part of appellants' interference claim is based on Burnett's protected activity of calling Windrows and writing a letter to City residents (factors 1 & 4), appellants must show that the claim has "minimal merit."

24

(*Park*, *supra*, 2 Cal.5th at p. 1061.)

       1.  *Applicable Law*

Under section 425.16, subdivision (b)(2), "'the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'''" (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88-89.)  To do so, the plaintiff must only establish that their cause of action has "minimal merit." (*Kinsella v. Kinsella* (2020) 45 Cal.App.5th 442, 460.)

This requires the plaintiff to "demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated." (*Baral v.* Schnitt, *supra*, 1 Cal.5th at p. 396.)  At this stage, "'"[t]he court does not weigh evidence or resolve conflicting factual claims.  Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment.  It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law."'" (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 891.)  "In this sense, the anti-SLAPP statute operates like a 'motion for summary judgment in "reverse."'" (*Ralphs Grocery* (2017) 17 Cal.App.5th 245, 261.)

"In determining whether the plaintiff has made a prima facie evidentiary showing on the second prong of the anti-SLAPP inquiry, we consider the pleadings and the evidence adduced on the motion.  [Citation.]  We neither weigh the credibility nor

25

compare the probative strength of competing evidence (citation), and we disregard declarations lacking in foundation or personal knowledge, or that are argumentative, speculative, impermissible opinion, hearsay, or conclusory.  [Citation.]"  (*Dwight R. v. Christy B.* (2013) 212 Cal.App.4th 697, 714.)

2.  *Evidentiary Issues*

The trial court sustained 10 of the City's objections to appellants' two declarations submitted in support of their opposition and excluded portions of the declarations, but overruled the City's remaining 10 objections.  Appellants do not address these evidentiary rulings in their opening brief, so they have forfeited any argument that the trial court erroneously sustained the City's objections.  (See *Roe v. McDonald's Corp.* (2005) 129 Cal.App.4th 1107, 1114.)  We therefore do not consider appellants' evidence that the trial court excluded.  (*Villanueva v. City of Colton* (2008) 160 Cal.App.4th 1188, 1196.)

3.  *Analysis*

To succeed on a claim for intentional interference with prospective economic advantage, the plaintiff must show:  "(1) the existence, between the plaintiff and some third party, of an economic relationship that contains the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally wrongful acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm proximately caused by the defendant's action"  (*Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc.* (2017) 2 Cal.5th 505, 512.)  A

26

claim for negligent interference with prospective economic advantage has the same elements, except that the defendant's conduct is alleged to have been negligent, not intentional. (*Crown Imports, LLC v. Superior Court* (2014) 223 Cal.App.4th 1395, 1404.)

Appellants have failed to show that they satisfied the second element. They argue that defendants "should have known" about their relationship with prospective students' families and Jay Kim Construction.

As to Jay Kim Construction, the evidence appellants cite does not support their argument.[7] Page 315 of the record is an email from Turner to an unidentified Yang. Page 467 of the record is a map of the project area showing morning peak hour intersection traffic movements. Neither page is evidence of appellants' purported relationship with Jay Kim Construction, and neither page suggests defendants knew of that relationship.

As to the prospective student families, appellants concede that there is no evidence showing that defendants knew about their relationships with prospective student families, but appellants argue defendants "should have known" about the relationships. Appellants acknowledge an interference claim requires a plaintiff to show ""defendant knew of the existence"" of an economic relationship between the plaintiff and a third party. (See *North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 786

---

[7] Appellants also rely on a portion of Jayawardana's declaration, but the trial court sustained the City's objection to it. For the reasons explained above, we decline to consider this evidence.

[negligent interference]; *Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc.*, *supra*, 2 Cal.5th at p. 512 [intentional interference].)

Because appellants have failed to show that defendants knew about appellants' relationship with prospective student families, they cannot establish a necessary element of their interference claim. They therefore cannot satisfy their burden of showing the claim has minimal merit with respect to Burnett's protected activity.[8]

IV.

DISPOSITION

The trial court's order granting the City's anti-SLAPP motion is reversed in part and affirmed in part. Each party shall bear their own costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
Acting P. J.

We concur:

FIELDS
J.

RAPHAEL
J.

---

[8] In a footnote at the conclusion of their opening brief, appellants ask us to remand the matter and direct the trial court to allow appellants to conduct discovery. We decline to do so. The trial court may revisit the issue on remand.